**STATE of Alaska, Petitioner,**

v.

**Timothy SEARS, Respondent.**

**No. 2446.**

Supreme Court of Alaska.

Aug. 20, 1976.

William H. Hawley, Jr., Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for petitioner.

Phillip D. Weidner, Mark A. Weaver, Asst. Public Defenders, Herbert D. Soll, Public Defender, Anchorage, for respondent.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR and ERWIN, Justices.

## OPINION

RABINOWITZ, Justice.

This petition for review questions whether illegally obtained evidence may be used in a probation revocation proceeding. The state does not dispute for purposes of this review that the evidence in question was the fruit of an illegal search and seizure.

Respondent Timothy Sears was placed on probation on April 30, 1973, after having pleaded guilty to the charge of accessory after the fact to the crime of burglary.[1] The court prescribed the usual general conditions of probation, including the condition that Sears comply with all municipal, state and federal laws and ordinances. Probation was to run until October 30, 1974, and sentencing was deferred for the same period of time. Probation was later extended for an additional 30 days.

On November 4, 1974, Sears' probation officer petitioned the court to revoke Sears' probation and impose sentence on the ground that Sears had violated one of the conditions of his probation, specifically the condition which provided that he was to comply with all municipal, state and federal laws. In the affidavit that accompanied the petition, the officer alleged that on or about October 16, 1974, Sears committed the offense of possession of marijuana for the purpose of sale and distribution. Sears denied the allegations of the petition, and a hearing on the petition was set for December 11, 1974, before Judge Burke. The court, on its own motion, continued the hearing until January 14, 1975.

In the interim, Sears was indicted for possession of marijuana for the purpose of sale and distribution[2] on the basis of the same facts that constituted the ground for the petition to revoke probation.[3] Sears moved to suppress the evidence in question, marijuana, arguing that it was the product of an illegal search. Judge Kalamarides ruled in Sears' favor and suppressed the evidence on January 13, 1975. That case was subsequently dismissed.

At the probation revocation hearing of January 14, 1975, Judge Burke stated that he believed Judge Kalamarides' decision on the legality of the October 6th search was binding upon him. Therefore, he refused to reconsider the question of whether the evidence was legally seized. He went on to state that under the terms of Criminal Rule 26(g) of the Alaska Rules of Criminal Procedure, he believed the state was precluded from making any use of the evidence at the revocation hearing. After submission of additional authority on the issue of whether Rule 26(g) properly applies to the instant situation, Judge Burke, on January 23, 1975, ordered the petition to revoke dismissed.[4] From this ruling the state seeks review. The order dismissing

1. AS 12.15.020.

2. AS 17.12.010.

3. Those facts are substantially as follows. On the evening of October 16, 1974, Officer Kaas of the Anchorage Police Department was on patrol when he saw several people alight from respondent's car in an alley behind a bar. One of these people was carrying a beer can. According to Officer Kaas, the car was proceeding slower than the speed limit, which made him suspicious that the driver might be under the influence of intoxicating liquor. He also noted that the car was missing a tail light. He directed the driver of the car to pull over, at which point respondent Sears got out and proceeded toward the patrol car, meeting Officer Kaas halfway. Apparently Sears walked without stumbling or staggering, and his breath did not smell of alcohol. Although the officer's preliminary investigation showed that Sears did not have a driver's license in his possession and that the car was not registered in Sears' name, no arrest was made at that

time. The officer checked by radio and found that Sears' license had been suspended. At that point Officer Kaas went up to the car, flashed his light inside, and saw a brown bag on top of several unopened cans of beer on the floor in front of the driver's seat. He opened the door, inspected the contents of the bag, and found what appeared to be marijuana. After finding the marijuana, the officer searched the rest of the car and found three pipes, believed to be marijuana pipes. Kaas then arrested Sears, charging him with possession of marijuana with intent to sell and distribute. No charges were filed with respect to the tail light violation. The record does not reflect and the state makes no claim that Officer Kaas knew of Sears' probationary status at that time.

4. Since the alleged marijuana offense was the sole ground on which the state was seeking to revoke probation, Judge Burke's decision to exclude the evidence deprived the state of the proof required to sustain the petition to revoke.

the petition to revoke was stayed pending review.

The question of whether the exclusionary rule should apply in probation revocation proceedings has never been decided by this court.[5] It is the state's contention that Criminal Rule 26(g) does not preclude the admission of illegally seized evidence in a probation revocation proceeding. Criminal Rule 26(g) states:

> Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness.

Moreover, the state argues that as a matter of policy, illegally seized evidence should be admitted in revocation proceedings. In considering this question we find ourselves in a unique position. Counsel have revealed to us no jurisdiction which has expressed the exclusionary rule in terms as broad as Alaska's Rule of Criminal Procedure 26(g).[6] Rule 26(g) goes beyond what have hitherto been considered the minimum constitutional requirements for an exclusionary rule. The question is how far it reaches. We turn now to an examination of the language, context and history of Rule 26(g).

Respondent argues that the language of Rule 26(g) is explicit in its prohibition of the use of illegally seized evidence: within the terms of the rule itself there apparently is no limitation on the kind of illegally seized evidence to be excluded, the type of criminal proceeding from which it is to be excluded, or the uses which are prohibited.

The state asserts, however, that despite the seemingly unequivocal language of Rule 26(g), the context in which the rule is found indicates that the rule is intended to apply only to trial proceedings, and not to probation revocation proceedings. Rule 26 falls within Part VI (Rules 23–31) of the Rules of Criminal Procedure, which is entitled "Trial". Petitioner argues that the section titles of the criminal rules denominate the various purposes of the different rules, and that therefore application of Rule 26 is limited to trial situations. In addition, petitioner points out that Rule 26 itself begins in subsection(a), with a reference to its applicability at trial.[7]

Criminal Rules 1 and 2, which concern the general scope, purpose and construction of the criminal rules, provide in part as follows:

> Rule 1. *Scope.* These rules govern the practice and procedure in the superior court in *all criminal proceedings* . . . .
>
> Rule 2. *Purpose and Construction.* These rules are intended to provide for the just determination of *every criminal proceeding.* . . . [emphasis added]

When read together with Rule 26(g), Rules 1 and 2 tend to support respondent's argument that Rule 26(g) is a rule of gen-

5. The question was presented to us in *Hunnicutt v. State*, 527 P.2d 1292 (Alaska 1974), but the case was remanded for further proceedings without the question having been resolved.

6. Exclusionary doctrine has developed primarily through judicial decision. *See, e. g., Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Olmstead v. United States*, 277 U.S. 438, 471, 48 S.Ct. 564, 72 L.Ed. 944, 953 (1928) (Holmes, J., separate opinion). It was formulated by the United States Supreme Court and extended to the states in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

7. Alaska Rule of Criminal Procedure 26 provides in part:

(a) In General. *In all trials* the testimony of witnesses shall be taken orally in open court, unless otherwise provided by statute or by these rules. The admissibility of evidence shall be governed by Civil Rule 43 and by these rules, or in the absence of rule, by the principles of common law as they may be interpreted by the courts of the state in the light of reason and experience. In the absence of rule, the evidence shall be presented according to the most convenient method prescribed by common law principles, and the principle which favors the reception of the evidence shall govern. The competency and privileges of witnesses shall be governed by Civil Rule 43 and by these rules, or in the absence of rule, by common law principles. [emphasis added]

eral applicability,[8] which is to be applied in all criminal proceedings except where rules or statutes provide otherwise. If parole or probation revocation hearings are "criminal proceedings" within the meaning of the rules, a conclusion that Criminal Rule 26(g) applies to them would be mandated.

However, it is important to recognize that a probation or parole revocation proceeding is distinguishable from normal adjudications of guilt at trial. In *Martin v. State,* 517 P.2d 1389, 1398 (Alaska 1974), we said:

> However, a probation revocation hearing is not a criminal prosecution looking toward an adjudication of guilt or innocence. . . .
>
> We do not interpret Article I, section 11 of the Alaska Constitution to extend the right of bail to probation revocation proceedings. While the Alaska Constitution and statutes insure to the accused in all criminal prosecutions a right to bail, Martin was not the accused in a criminal prosecution at the time he requested bail from the trial court.[9] [footnotes omitted]

Probation or parole revocation proceedings then are not a part of the normal criminal process. At the point where a party is potentially subject to such a proceeding he has already been adjudicated a criminal and a court has already passed sentence. We therefore hold that probation and parole revocation proceedings are not criminal proceedings within the meaning of our Rules of Criminal Procedure.

The history and policy behind Rule 26(g) add support to our conclusion that the rule was not meant to apply to probation or parole revocation hearings. Rule 26(g) as it presently exists was drafted by the Criminal Rules Revision Commission in 1972 and adopted by this court in 1973. On July 11, 1972, the committee, chaired by Avrum Gross, submitted its proposed rule changes in a report addressed to then Chief Justice Boney.[10] The committee's notes on the proposed rules, and the accompanying letter of transmittal, contain comments material to our inquiry into the intent and policy behind Rule 26(g). The committee's notes to the proposed Rule 26(g) are as follows:

> Rule 26—Subsection (g) is proposed to make clear that the protections of the Miranda Rule are not eroded. See *Harris v. New York,* 401 U.S. 222 [, 91 SCt. 643, 28 L.Ed.2d 1] . . . (1971) and

---

8. The superior court found the broad language of Rule 1 highly persuasive in determining that Rule 26(g) was applicable in probation revocation proceedings.

9. *See also McGinnis v. Stevens,* 543 P.2d 1221, 1226 (Alaska 1975), where concerning prisoners' rights in prison disciplinary hearings we relied on *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and stated:

   . . . we are in agreement with *Wolff* that a disciplinary hearing is not a criminal trial. The inmate is not charged with a violation of criminal statute, nor is the inmate's liberty as a free citizen threatened by potential curtailment. Thus, in accord with *Wolff,* we hold that an inmate in a major disciplinary proceeding is not entitled to the full panoply of rights due an accused in a criminal proceeding. [footnote omitted]

   *Compare Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 781–82, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

   Our holding in *Martin* adds support to our conclusion, *infra,* that probation and parole revocation proceedings are not "criminal proceedings" within the meaning of our Rules of Criminal Procedure. Our decision there was made with awareness of Alaska Rule of Criminal Procedure 41(a), which provides in part:

   *Admission to Bail.* The defendant in a criminal proceeding is entitled to be admitted to bail . . . .

   Had we concluded that Martin was a defendant in a criminal proceeding, there would have been no need in that case to reach a constitutional analysis.

10. The Report of the Criminal Rules Revision Commission includes a letter addressed to The Honorable George F. Boney and the committee's notes to the proposed criminal rules. It is available upon request from the State Law Librarian. Also included is the "voted copy" of the proposed rule changes.

the standing problem discussed in *Dimmick v. State,* 473 P.2d 616 (Alaska 1970). Note: It must [*sic*] emphasized that a split exists within our committee concerning the inclusion of proposed Rule 26(g) which reads:

'Evidence illegally obtained shall not be used for any purpose including the impeachment of a witness.'

The minority believe the police can be properly disciplined without turning criminals free. The majority adopt the reasoning of Justice Connor in *Dimmick v. State,* 473 P.2d 616, 625 (Alaska 1970) that it is important that the government obey the law as well as enforce it and by excluding otherwise probative evidence official misconduct is deterred. The minority would at least want an objective test as proposed by Justice Rabinowitz at page 622 in *Dimmick.*

It should be emphasized that Proposed Rule 26(g) is a substantial change. The majority consider the policy of the proposal can be decided in the abstract best since the pressure and publicity of an actual defendant whose conviction might be reversed are absent.

Both petitioner and respondent refer to the committee's comments to support their respective positions concerning the intent and policy underlying the formulation of Rule 26(g). Petitioner asserts that Rule 26(g) was drafted primarily to counter the rules promulgated in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Dimmick v. State,* 473 P.2d 616 (Alaska 1970); therefore, Rule 26(g) should be limited in scope to the questions addressed in those cases. Petitioner bases its assertion on the circumstance that these were the specific questions about which the committee expressed concern in its commentary to Rule 26(g). Petitioner also cites to the note following the draft version of the rule, which states:

Subsection (g) is intended to offset the erosion of the Miranda Rule permitted in *Harris v. New York,* 401 U.S.

222, 91 S.Ct. 643, 28 L.Ed.2d 1 . . . (1971) and the standing problem discussed in *Dimmick v. State,* 473 P.2d 616 (Alaska 1970).

The holdings of *Harris* and *Dimmick* imposed serious restrictions upon the scope of the exclusionary remedy. In *Harris,* the United States Supreme Court upheld the impeachment of a defendant by his prior statement obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Harris* decision established a collateral use exception to the exclusionary rule by authorizing a particular use of illegally obtained evidence for purposes other than direct proof of guilt. *Dimmick* holds that the exclusionary remedy cannot be utilized by a defendant who was not the immediate victim of a *Miranda* violation.

The comments make it clear that Rule 26(g) was designed to apply to the *Harris* and *Dimmick* situations and can be inferred not to apply to probation or parole revocation proceedings. First, the drafters never professed to have contemplated such proceedings in promulgating the rule. Indeed, the reference to the ". . . actual defendant whose conviction might be reversed" indicates that the drafters contemplated proceedings where a subject could be convicted. Yet one is not "convicted" in a parole or probation revocation proceeding. Second, the concern with deterrence of police misconduct expressed in the committee notes is not, as we demonstrate *infra,* applicable to the instant case. We now proceed to examine the rationales underlying the exclusionary rule, for the twin purposes of demonstrating that deterrence of police misconduct does not carry the same force as it would were this a proceeding looking towards adjudication of guilt and that, Alaska's criminal rules aside, Alaska's constitution does not require application of exclusionary rules to the instant situation.

■ In regard to the purpose of the exclusionary rule, federal precedent and our own decisions establish that the rule has

twin rationales. One of these rationales is deterrence of unconstitutional methods of law enforcement.[11] The other rationale is the imperative of judicial integrity which requires that the courts not be made "party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions."[12]

An analysis of the deterrence goal of the exclusionary rule and its relation to Alaska's system of probation is appropriate here. This court must answer the question whether extension of the exclusionary rule to probation revocation hearings would further the goal of deterrence (of unlawful methods of law enforcement) sufficiently to outweigh the need for use of the evidence thus secured to promote the enforcement of a rational probation system. Theoretically, any time illegally seized evidence is excluded, the deterrent impact of the exclusionary rule as presently administered is incremented. However, invocation of the exclusionary rule in probation revocation proceedings would yield only a minimal additional deterrent effect which is outweighed by the needs of our probation system.

When faced with this question, the Supreme Court of California, in *In re Martinez,* 1 Cal.3d 641, 83 Cal.Rptr. 382, 463 P. 2d 734, 740, *cert. denied,* 400 U.S. 851, 91 S.Ct. 71, 27 L.Ed.2d 88 (1970), concluded that

. . . the incremental deterrent effect that will realistically be achieved by shielding the Adult Authority from illegally procured evidence is slight; the bungling police officer is not likely to be halted by the thought that his unlawful conduct will prevent the termination of parole because the authority cannot consider the evidence that he unlawfully procures. When, as in the instant case,

the police are not even aware that a suspect is a parolee, the supplemental deterrent factor is, of course, completely absent.

More recently, the Ninth Circuit answered the question in a similar manner. In *United States v. Winsett,* 518 F.2d 51, 54 (9th Cir. 1975), Judge Choy wrote:

Application of the exclusionary rule to the probation revocation proceeding in this case would achieve a deterrent effect speculative or marginal at best. Whatever deterrence of police misconduct results from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to probation revocation proceedings would significantly further that goal. *See United States v. Hill,* 447 F. 2d 817, 819 (7th Cir. 1971); *United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161, 1164 (2d Cir. 1970). Such an extension would deter only police searches and arrests consciously directed toward probationers. [footnote omitted]

Both the Supreme Court of California and the Ninth Circuit further concluded that any marginal deterrent effects which would flow from application of the exclusionary rule were far outweighed by the potentially disastrous consequences which would follow the imposition of the exclusionary rule in parole or probation proceedings. As articulated by the Ninth Circuit, the primary purpose of probation is

. . . to promote the rehabilitation of the criminal by allowing him to integrate into society as a constructive individual, without being confined for the term of the sentence imposed. Cf. *Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). . . . Because violation of probation conditions may indicate that the probationer is not ready or is incapable of re-

11. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669, 1677 (1960); *J. M. A. v. State,* 542 P.2d 170 (Alaska 1975).

12. *Terry v. Ohio,* 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889, 901 (1968); *J. M. A. v. State,* 542 P.2d 170 (Alaska 1975).

habilitation by integration into society, it is extremely important that *all reliable* evidence shedding light on the probationer's conduct be available during probation revocation proceedings.[13] [footnote omitted] [emphasis in original]

518 F.2d at 54–55.

In the case at bar Sears had pled guilty to the crime of accessory after the fact to burglary. As was mentioned previously, as a condition of probation, the sentencing court required that Sears abide by all municipal, state, and federal laws and ordinances. Subsequently, a petition for revocation of Sears' probation was filed on the ground that Sears had committed the offense of possession of marijuana for the purpose of sale and distribution in violation of the express terms of his probation. Clearly, it would be destructive of the purpose of probation to hold that the sentencing court is forbidden to consider relevant facts concerning Sears' possession of marijuana in determining whether Sears should be allowed to continue on probationary status. If Sears' rehabilitation is

to be furthered and society protected from antisocial conduct, then it is crucial to rational decision-making that this significant information not be denied the very court which initially imposed probation. Here the needs of the probation system clearly outweigh the possible deterrence of unlawful methods of law enforcement.

Given our conclusion that a probation or parole revocation hearing is not a criminal proceeding, we find the reasoning of the Supreme Court of California and the Ninth Circuit Court of Appeals persuasive and are led to the conclusion that the needs of Alaska's probation system significantly outweigh any benefits which would flow from our mandating that the exclusionary rule is applicable to probation revocation proceedings.[14]

Further, we do not think that considerations of the imperative of judicial integrity dictate a contrary result. First, we recognize that the illegally seized marijuana is suppressible in any prosecution of Sears for the crimes of possession or possession with the intent to sell.[15] Second, the im-

---

13. In *In re Martinez*, 1 Cal.3d 641, 83 Cal. Rptr. 382, 463 P.2d 734, 740, *cert. denied*, 400 U.S. 851, 91 S.Ct. 71, 27 L.Ed.2d 88 (1970), the Supreme Court of California adopted a parallel position:

On the other hand, the social consequences of imposing the exclusionary rule upon the [Adult Authority] can be disastrous. Conceivably, if the improperly obtained evidence were the sole basis for parole revocation, the authority might find itself unable to act in the case of the paroled murderer whom the police improperly discovered had cached a minor armory for future use or the paroled narcotics peddler who had collected a quantity of heroin for future sale. Although we recognize, of course, that such evidence would not be admissible in a court of law, we believe that an agency whose delicate duty is to decide when a convicted offender can be safely allowed to return to and remain in society is in a different posture than the court which decides his original guilt. To blind the authority to relevant facts in this special context is to incur a risk of danger to the public which, at least as of this date, outweighs the competing con-

siderations of a problematical gain in deterrence.

14. *See also United States v. Farmer*, 512 F. 2d 160 (6th Cir. 1975), *cert. denied*, 423 U.S. 987, 96 S.Ct. 397, 46 L.Ed.2d 305, 44 U.S.L.W. 3305; *United States v. Brown*, 488 F.2d 94 (5th Cir. 1973); *United States v. Hill*, 447 F.2d 817 (7th Cir. 1971); *United States ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161 (2d Cir. 1970); *People v. Dowery*, 20 Ill.App.3d 738, 312 N.E.2d 682 (1974), *aff'd*, 62 Ill.2d 200, 340 N.E.2d 529, 18 Crim.L.Rep. 2268 (1975); *Stone v. Shea*, 113 N.H. 174, 304 A.2d 647 (1973); *Commonwealth v. Kates*, 452 Pa. 102, 305 A.2d 701 (1973); *Reeves v. Turner*, 28 Utah 2d 310, 501 P.2d 1212 (1972); *State v. Kuhn*, 7 Wash.App. 190, 499 P.2d 49 (1972).

15. This is precisely the course adopted by the superior court in response to Sears' motion to suppress the evidence in conjunction with his prosecution for the crime of possession of marijuana for the purpose of sale and distribution.

As indicated previously, it is not contested here that the marijuana was seized illegally, and therefore we are not required to pass on that issue.

perative of judicial integrity was initially met when Sears pled guilty to the charge of accessory after the fact to the crime of burglary. There is no intimation in this record that the guilty plea on Sears' part was in any manner engendered by a lawless invasion of constitutional rights or by the government's use of the fruits of such invasion. Third, in the special context of a probation violation proceeding, it is our belief, on the balance, that the facts of this case present no such threat to the imperative of judicial integrity as to outweigh the clear need of the sentencing court to know whether the probationer is conducting his life in a manner which warrants continuation of his present probationary status, or whether because of antisocial conduct the goal of rehabilitation is not being furthered and thus, either a change in the conditions of probation, or incarceration, is necessary in order to protect society.

■ We can conceive of circumstances which would lead to the application of the exclusionary rule to revocation of probation proceedings. *E. g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed 183 (1952). In short, police misconduct which shocks the conscience, or is of a nature that calls for the judiciary, as a matter of judicial integrity, to disassociate itself from benefits derivable therefrom, would lead us to invoke the exclusionary rule. *See, e. g., People v. Dowery,* 20 Ill. App.3d 738, 312 N.E.2d 682 (1974), *aff'd,* 60 Ill.2d 200, 340 N.E.2d 529, 18 Crim.L. Rep. 2268 (1975).

■ One additional comment is necessary here. In the event the lawless arrest and search or seizure is carried out by enforcement personnel with knowledge or reason to believe the suspect was a probationer, we would then apply the exclusionary rule in the probation revocation proceeding. For, in such a circumstance, the bar of the exclusionary rule would act as a significant deterrent to searches and arrests consciously directed toward probationers. In this regard we are in accord with the Ninth Circuit's opinion in *United States v. Winsett,* 518 F.2d 51, 54, n. 5 (9th Cir. 1975), where the court stated:

. . . when the police at the moment of search know that a suspect is a probationer, they may have a significant incentive to carry out an illegal search even though knowing that evidence would be inadmissible in any criminal proceeding. The police have nothing to risk: If the motion to suppress in the criminal proceedings were denied, defendant would stand convicted of a new crime; and if the motion were granted, the defendant would still find himself behind bars due to revocation of probation. Thus, in such circumstances, extension of the exclusionary rule to the probation revocation proceeding may be necessary to effectuate Fourth Amendment safeguards.

For the foregoing reasons, we reverse the superior court's determination that the evidence in question should be suppressed and remand the matter for further probation revocation proceedings in conformity with this opinion.[16]

ERWIN, J., concurs.

CONNOR, J., dissents.

BURKE, J., not participating.

ERWIN, Justice (concurring).

While I agree that the Alaska Constitution does not require application of exclu-

---

16. Since we are not confronted with any issue regarding a probationer's waiver of fourth amendment rights or rights under Article I, section 14 of the Alaska Constitution, we do not consider this an appropriate occasion for a detailed discussion of this problem. We note though, that the extent of probationers' and paroulees' fourth amendment rights has been recently examined by the Ninth Circuit in *Latta v. Fitzharris,* 521 F.2d 246 (9th Cir. 1975) ; and *United States v. Consuelo-Gonzalez,* 521 F.2d 259 (9th Cir. 1975). *See also Tamez v. State,* 534 S.W.2d 686, 19 Crim.L. Rep. 2026 (Tex.Cr.App., 1976).

sionary rules in the case at bar, I have significant reservations with the majority opinion's language concerning the scope of Criminal Rule 26(g). In light of this decision, I strongly urge that the Criminal Rules Revision Committee re-examine Rule 26(g) and determine whether it was in fact promulgated to cover situations other than criminal proceedings.

CONNOR, Justice (dissenting).

I must respectfully dissent.

I do not believe that Rule 26(g) of the Alaska Rules of Criminal Procedure was designed to apply only to the situations presented in *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Dimmick v. State*, 473 P.2d 616 (Alaska 1970). I am not persuaded that the rule should be interpreted as barring one collateral use exception to the exclusionary rule, i. e., impeachment, and not another such exception, i. e., probation revocation proceedings.

Rule 26(g) works, at a minimum, to bar the use of illegally obtained evidence for the purpose of directly proving guilt. Furthermore, as the Alaskan expression of the constitutionally mandated exclusionary rule,[1] it necessarily operates to remedy a violation of federal Fourth Amendment rights as well as the Fifth and Sixth Amendment rights addressed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).

The commentary pertaining to 26(g) clearly indicates the committee's intent to guarantee, by means of the new criminal rule, an exclusionary remedy which would prohibit the collateral as well as direct use of illegally obtained evidence—at least with regard to its use for impeachment purposes. The state urges us to distinguish between one collateral use of illegal evidence and another. The state argues that although 26(g) was designed to extinguish the collateral use exception to the exclusionary rule that was established in

*Harris*, it was not intended to prohibit the collateral use of illegal evidence for probation revocation purposes. I do not find merit in the distinction that the state would draw, either on the basis of the history of the rule or on grounds of policy.

Examination of the rules committee's comments reveals that the committee's concern was not so much with the specific circumstances present in Harris and *Dimmick*, as with the more pervasive problem of the erosion of constitutional rights. The committee's notes do not indicate that its members found the use of illegally obtained evidence for impeachment purposes to be the only problem addressed, except insofar as it affected constitutional rights. The committee's attention was focused on the erosion of constitutional protections by the *Harris* and *Dimmick* decisions, and on general notions of exclusionary policy as enunciated in the dissent (Connor, J.) in *Dimmick v. State, supra*, at 623.

The exclusionary remedy is the primary means of effectuating certain basic constitutional rights. When the scope of the remedy is curtailed, protection of those rights is likewise limited. To establish a collateral use exception for probation revocation proceedings means that the constitutional rights for which protection was intended in the drafting and adoption of Rule 26(g) are again subject to erosion.

Moreover, I believe that the general policy underlying the exclusion of illegally obtained evidence merits application of the exclusionary rule in probation revocation proceedings. The function of the exclusionary rule is two-fold: (1) the deterrence of official lawlessness by eliminating the prosecutorial benefits of such lawless behavior, and (2) the furtherance of the imperative of judicial integrity, which demands that the courts not be made "party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions." *Terry v. Ohio*, 392 U.S. 1, 12–13,

---

1. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968).[2] A recurring theme in the development of exclusionary doctrine has been the emphasis placed on these two aspects of the rule.[3]

As the trial court noted in its decision below, because of the small number of criminal cases which actually reach trial, the deterrent effect of the exclusionary rule is severely limited if illegally obtained evidence is inadmissible only at trial proceedings.[4] Furthermore, the use of such evidence at probation revocation proceedings provides substantial incentive for unconstitutional searches and seizures. Thus I am persuaded that the deterrence of unconstitutional police practices will be furthered by the adoption of the exclusionary rule in probation revocation proceedings. I am certainly not persuaded by what has been presented in the case before us that the incremental deterrent effect of applying the exclusionary rule is so slight that it is outweighed by the needs of our probationary system.

There is nothing inherent in or peculiar to the probation system which justifies circumvention of the "imperative of judicial integrity", *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Some courts have found that in order for the rehabilitative function of probation to be fostered, the judge at the revocation hearing should know all of the circumstances of the case before him, whether or not the pertinent information was uncovered by illegal means.[5] These decisions, however, have failed to explain satisfactorily how the rehabilitative goals of probation would, in fact, be furthered by the admission of illegally obtained evidence. Moreover, such reasoning flies in the face of decisions such as *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), which emphasize that rehabilitative and therapeutic goals can no longer be used as an excuse for a lack of procedural safeguards and the deprivation of constitutional rights.[6]

2. The dissent (Connor, J.) in *Dimmick v. State, supra,* contains an extensive discussion of the origins and development of the exclusionary rule. There is no need to repeat that discussion here. However, one point should be clarified. The balancing test discussed at 473 P.2d at 628, should not be read to imply that a defendant's own Fourth Amendment rights may in any way be eroded. In the *Dimmick* dissent balancing was only applied to the question of whether a defendant has standing to raise the Miranda rights of another.

3. Undoubtedly, far greater emphasis has been placed on the deterrence function of the exclusionary rule. But see the dissent of Brennan, J. in *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), joined by Douglas and Marshall, JJ., in which it is pointed out that the historical predecessors of the rule in its current form were based on grounds other than deterrence.

4. Respondent points out that, according to a recent study conducted by the Alaska Judicial Council, 94% of the felony cases disposed of in Alaska 1973 were resolved in non-trial proceedings. *See* B. Cutler, Sentencing in Alaska: A Description of the Process and Summary of Statistical Data for 1973, 84 (Alaska Judicial Council, March 1975).

5. *See, e. g., United States ex rel. Sperling v. Fitzpatrick,* 426 F.2d 1161, 1163–64 (2nd

Cir. 1970) (a parole revocation); *United States ex rel. Lombardino v. Heyd,* 318 F. Supp. 648, 651 (E.D.La.1970), *aff'd per curiam,* 438 F.2d 1027 (5th Cir. 1971).

6. In *Gault,* the Supreme Court was highly critical of the constitutional and theoretical bases of juvenile justice administration, particularly with respect to the traditional reliance on the doctrine of *parens patriae.* It noted: "The Latin phrase proved to be of great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic creditials are of dubious relevance." 387 U.S. at 16, 87 S.Ct. at 1437.

One commentator has stated:

"*Gault* made it perfectly clear that the court is relucant to be hemmed in by such artificial labels as 'criminal,' 'civil,' or 'quasi-administrative.' If *Gault's* primary concern was with the procedural niceties of entry *vel non* into a deprivation process, the court also demonstrated that a desire to help—the rehabilitive ideal—no longer will serve as the incantation before which procedural safeguards must succumb." Cohen, "Sentencing, Probation, and the Rehabilitative Ideal: the View from *Mempa v. Rhay,*" 47 Texas L.Rev. 1, 3 (1968).

Of even greater significance is the impact of the case before us on the integrity of the judicial process. Historically the exclusionary rule did not arise merely from the need to deter official misconduct. Rather it was designed to keep intact certain values basic to our constitutional system of government.

The Founding Fathers did not believe that any one branch of government could be relied upon to honor or make effective the fundamental guarantees contained in the Constitution and the Bill of Rights. What they hoped was that the interplay between the several branches of government would keep alive the protections which they had incorporated into the basic document which was to set permanently the organic pattern of American government. It must be remembered that the guarantees of the Bill of Rights were regarded as so important that they were considered as a necessary precondition to the acceptance of the Constitution itself  The citizens of the several states were unwilling to delegate power to a strong central government without positive guarantees of individual freedom and liberty which, it was thought, would stand as a barrier against the tendency of any strong government toward oppressive mastery of its citizens.

The Bill of Rights did not emerge as an abstract statement of desirable governmental values in an ideal world. What it did represent was a positive expression of restraint against the abuse of governmental power. The Bill of Rights reflected a suspicion on the part of the several states and their citizenry that, unless restrained by

positive utterances in our organic law, the government could not be trusted to abstain from obliterating the very rights and freedoms for which the American Revolution had been fought.

It was perceived by the framers that the role of the judiciary was vital to the preservation of the fundamental guarantees of the Bill of Rights. In an address to Congress, James Madison stated:

"[I]ndependent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789).

By its very nature the judiciary has neither the power nor the machinery to direct the everyday operations of government. It can act only upon justiciable issues brought before it in the form of actual cases and controversies. Moreover, the protection of fundamental constitutional rights is often accomplished by negation, i.e., by a refusal on the part of the courts to validate unconstitutional behavior by the other branches of government.[7] Hence the exclusionary rule as to illegally obtained evidence.[8]

Many jurists have observed that if the courts permit unlawful action by other branches of government they become parties to the wrong. When they permit the use of unconstitutionally obtained evidence in judicial proceedings they render the con-

---

7. As Mr. Justice Brandeis noted in his dissent in *Olmstead v. United States*, 277 U.S. 438, 484, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the exclusion of unconstitutionally obtained evidence is necessary to maintain respect for law and to preserve the judicial process from contamination. "The rule is one, not of action, but of inaction." 277 U.S. at 484, 48 S.Ct. at 575.

8. For the historic background of the Fourth Amendment see *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886);

*Harris v. United States*, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (Frankfurter, J., dissenting) (1947); *United State v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (Frankfurter, J., dissenting) (1950); and Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937). *See also* our own opinion in *Fresneda v. State*, 458 P.2d 134, 139–40 (Alaska 1969), and my dissent in *Dimmick v. State*, 473 P.2d 616, 624–26 (Alaska 1970).

stitutional guarantee a nullity and, in effect, indicate their approval of lawless conduct.

As Mr. Justice Brandeis observed in his classic dissent in *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928):

> "In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."

In that same case Mr. Justice Holmes said:

> "[W]e must consider the two objects of desire both of which we cannot have and make up our minds which to choose. It is desirable that criminals should be detected, and to that end that all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. . . . We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part.
>
> . . . If the existing code does not permit district attorneys to have a hand in such dirty business it does not permit the judge to allow such iniquities to succeed."

Unless the exclusionary rule is applied against all forms of official lawlessness we engage in governmental hypocrisy of the most serious kind. For we are not dealing merely with ordinary legalities but with fundamental constitutional values of first magnitude. Freedom from unlawful searches and seizures goes to the very core of our constitutional heritage, encompassing as it does our right to privacy and to protection from arbitrary governmental intrusion into our lives.

Unless some meaningful consequence follows from the violation of constitutional rights, those rights become merely a form of words without substantive content. To the extent that we condone official lawlessness we become parties to the subversion of constitutional rights, and we fail to support and defend the constitution, which we are sworn to do.[9]

When the exclusionary rule is viewed in light of the imperative of judicial integrity, it is of no moment that the case before us is a probation revocation proceeding. The nature of the proceeding does nothing to remove the constitutional taint which attaches to the proffered evidence. The principle of judicial refusal to be a party to wrongdoing remains the same.[10]

As Mr. Justice Grimes observed, dissenting in *Stone v. Shea,* 113 N.H. 174, 304 A. 2d 647, 649–50 (1973), the use in probation revocation proceedings of evidence obtained in violation of the Fourth Amendment results in a society dependent upon transgressing the very charter of its own existence.[11] Recent historical events in the United States should have taught us the importance of adhering to basic constitutional commands, and how fraught with peril are the claims that expediency or

---

9. See the opinions of Brennan, J., (dissenting) in *United States · v. Calandra,* 414 U.S. 338, 355, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *People v. Cahan,* 44 Cal.2d 434, 282 P.2d 905 (1955) (majority opinion of Traynor, J.), and the dissenting opinion of Peters, J., in *In Re Martinez,* 1 Cal.3d 641, 83 Cal. Rptr. 382, 463 P.2d 734, 741–45 (1970).

10. It is notable that some courts exclude illegally obtained evidence even in administrative proceedings, not criminal in nature.

*See, e. g., One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *Knoll Associates, Inc. v. Federal Trade Commission,* 397 F.2d 530 (7th Cir. 1968); *Leogrande v. State Liquor Authority,* 25 A.D.2d 225, 268 N.Y.S.2d 433, *reversed on other grounds,* 19 N.Y.2d 418, 280 N.Y.S.2d 381, 227 N.E.2d 302 (1967).

11. *Accord: Michaud v. State,* 505 P.2d 1399 (Okl.1973).

governmental necessity should override the fundamental guarantees of personal liberty which are basic to a free society.

As I urged in *Dimmick v. State, supra,* (dissenting), we must close the courthouse door to evidence obtained in violation of fundamental constitutional rights. Our failure to do so validates the role of government as lawbreaker, it betrays our obligation to support and defend the constitutions of the United States and Alaska, and it renders ineffective one of the most important guarantees necessary to the maintenance of a free society.

I would affirm the ruling of Judge Burke, and would exclude the illegally obtained evidence at the trial of this case.