**Jerome GUIDRY, Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6362.**

Supreme Court of Alaska.

Oct. 7, 1983.

---

Patrick J. McKay, Pestinger & McKay, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, Norman L. Gorsuch, Atty. Gen., Juneau, for appellee.

Christine Schleuss, Asst. Public Defender and Dana Fabe, Public Defender, Anchorage, for amicus curiae.

Before BURKE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and SCHULZ, Superior Court Judge.*

OPINION

MATTHEWS, Justice.

Jerome Guidry, Jr. petitioned for hearing in his case after the Court of Appeals upheld a magistrate's refusal to suppress certain evidence seized from Guidry's home pursuant to a search warrant. The issues in this case revolve around the use of undercover operatives in criminal investigations. We affirm.

On February 24, 1981, a motorist reported the remains of a moose near Mile 73 of the Sterling Highway. The Department of Public Safety, Division of Fish and Wildlife Protection, investigated the sighting and found the remains. Examination of the remains uncovered the point end of an ol-

---

* Schulz, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

ive-drab colored metal arrow shaft in the viscera of the remains of a cow moose and .22 caliber shell fragments in the remains of both the cow and a calf moose. Since there was no cow moose season that year on the Kenai Peninsula, the remains were from an illegal moose kill.

On March 1, 1981, an informant contacted the office of the Division of Fish and Wildlife Protection, and on March 4, Lieutenant Steve Reynolds met with the informant. The informant, who asked to remain anonymous, gave Reynolds the following information: Two men who lived in the vicinity of St. Teresa's Bible Camp in the Sterling area had killed the two moose. One of the men owned a two-tone brown 1980 Ford pick-up truck and was "on the Slope" at that time. One of the men worked at Camco, a local business. The moose had been killed behind the house in which the two men lived. The moose were killed with a bow and arrow and a .22 caliber weapon.

On March 6, 1981, a different anonymous informant called the office and indicated that Jerry Guidry was the man responsible for the moose kill.

Lieutenant Reynolds continued the investigation, using the information provided by the two informants. At his direction, Corporal Dan France contacted Camco to see whether any of its employees lived in the vicinity described by the first informant. He was told that an employee named David Brenham lived in that area and that Brenham was up on the Slope at that time. The Department of Motor Vehicles was also contacted. It was learned that Brenham owned a 1980 brown Ford pick-up and that Jerry Guidry owned a 1978 red Ford pick-up. The license number of each vehicle was obtained.

On March 9, 1981, Officers Wood and Painter of the Division of Fish and Wildlife Protection attempted to investigate the Guidry residence. They went driving in the area of St. Teresa's Bible Camp, hoping to spot a two-tone brown Ford pick-up. They were in a division truck; Officer Painter was in uniform, while Officer Wood wore plain clothes all day. They spotted the brown Ford pick-up in the driveway of a house, but were unable to see the license number from the road to verify whether it was David Brenham's truck.

Officers Wood and Painter returned to the Fish and Wildlife Office. According to Reynolds, a couple of hours later he had Wood and France return to the area in Wood's personal vehicle. Corporal France indicated that by that time Guidry was a suspect and that he changed into plain clothes so that Guidry would not be alerted that Wood and France were Fish and Wildlife Protection Officers. They went in Wood's personal vehicle for the same reason. The objective of this later trip was to verify the license plates on the vehicles in the driveway and to try to obtain some description of the area for possible later use in obtaining a search warrant. According to Wood, there was no intent to try to gain entry to the residence.

The two officers reached the residence, drove into the driveway, and France got out of the vehicle and struck up a conversation with Guidry. While standing twenty-five to thirty feet from the house, France asked Guidry questions about the property. He asked about the size of the lot, who owned it and adjoining properties, what real estate agencies to contact, and whether the land was for sale. Although France never specifically indicated that he wanted to buy the property, Wood testified that such a conclusion would be possible from the questions that France asked. Guidry was unable to answer all of France's questions and, suggesting that his wife might have more information in the house, he invited France into the residence. While Wood and Guidry's companion, Brenham, stayed behind, Guidry and France proceeded to the house. Upon approaching the house, France noticed two rib bones on the porch which from his experience he believed to be ribs from a calf moose. France expressed some hesitation about entering the house because he had shoes on, but Guidry and his wife told France to "come on in." France then went in and stood about five or six feet into the house away from the door.

Saying his name rapidly, he introduced himself as Dan France, but not Corporal France. From his location he observed some olive-drab arrows that resembled the arrow recovered from the moose remains.

A few moments after Guidry and France went to the house, Brenham invited Wood in as well. Wood also expressed some hesitation regarding her muddy boots, but then she accompanied Brenham into the house, standing about two feet inside the doorway. Although she did not see the ribs on the porch as she entered the house, she "practically stumbled over them" as she left. Her experience also convinced her that they were moose ribs. From her location near the doorway, Wood observed the olive-drab arrows, a longbow, and a crossbow.

On March 10, the following day, Lieutenant Reynolds testified at search warrant proceedings and Magistrate Jess Nicholas of Kenai issued a warrant for the search of the Guidry residence and the vehicles located there. The search yielded several packets of moose meat, a longbow and arrows, and hair and blood samples. Guidry was subsequently charged with taking moose out of season under AS 16.05.920(a) and 5 AAC 81.320(9) Unit 15, and with possession of illegally taken moose under AS 16.05.-920(a).

Guidry filed a motion to suppress the evidence seized, asserting that the search warrant had been based on information that had resulted from a prior illegal search. Magistrate Nicholas held an evidentiary hearing on the motion on May 5, 1981. After hearing the testimony of Officers Wood and France, the magistrate refused to suppress the evidence. However, he specifically found that the behavior of the officers while at the Guidry residence constituted a "facade" and stated it "shocks the sensibility of this court."

Guidry later entered a plea of no contest to unlawful possession of illegally taken moose, reserving his right to appeal the search of his premises. Magistrate Nicholas found him guilty, fined him $250, and sentenced him to 40 days in jail with 20 days suspended on the conditions that he commit

no similar violations for one year and that he forfeit the moose meat, a backpack, and the longbow and arrows.

Guidry appealed the issue of the legality of the search to the Court of Appeals, which affirmed the search's legality in a memorandum opinion. We granted Guidry's petition for hearing on September 28, 1982. In granting the petition, we invited the Public Defender Agency to file a brief as amicus curiae, which it has done.

## I. SEARCH AND SEIZURE

Guidry and amicus curiae rely upon the Alaska Constitution's search and seizure provision in arguing that the evidence seized should have been suppressed. Alaska Constitution Article I, section 14 provides:

The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Both Guidry and amicus argue that we are free to and should interpret this provision in a manner that is more protective of individual rights than federal court interpretation of the fourth amendment to the United States Constitution. Guidry points out that "the Alaska constitutional guarantee against unreasonable searches and seizures is broader than fourth amendment guarantees." *Zehrung v. State,* 569 P.2d 189, 199 (Alaska 1977), *modified on other grounds,* 573 P.2d 858 (Alaska 1978). He adds that he had an expectation of privacy in his home that society recognizes as reasonable. *Sumdum v. State,* 612 P.2d 1018, 1020 (Alaska 1980). An intrusion on this privacy constitutes a search, and if the intrusion is warrantless, it is per se unreasonable unless it falls within an exception to the warrant requirement. *Frink v. State,* 597 P.2d 154, 167 (Alaska 1979). If the State asserts that a warrantless search is valid under such an exception, it bears the burden of proving the exception. *Id.*

■ Guidry points out that the only exception argued below was that Guidry had consented to France's and Wood's entry into his house. According to *Erickson v. State,* 507 P.2d 508 (Alaska 1973):

[C]onsent to a search, in order to be voluntary, must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion, and is not lightly to be inferred.

*Id.* at 515 (footnote omitted) (quoting *Rosenthall v. Henderson,* 389 F.2d 514, 516 (6th Cir.1968)); *accord, Phillips v. State,* 625 P.2d 816, 817 (Alaska 1980). The question of voluntariness of consent must be determined from the totality of the circumstances, and knowledge of a right to refuse is only one factor to be considered. *Frink v. State,* 597 P.2d at 169 & n. 30; *Gray v. State,* 596 P.2d 1154, 1158 n. 18 (Alaska 1979).

■ Guidry essentially argues that a consent which is obtained as a result of a ruse is not voluntary because it is not intelligently given. Amicus contends that Alaska should adopt a "bright line rule" governing search and seizure questions where undercover law enforcement agents are involved. Amicus' proposed rule would draw the lines between police participation in illegal acts and police use of ruses in so-called "legitimate activity" situations. In the former, where the subject of investigation has already exposed his nefarious nature to the police agent, amicus would hold that he cannot complain of police trickery and thus evidence obtained pursuant to such trickery would not be suppressed. However, if a police agent's access to evidence is based on lies or tricks about the purpose of the visit that are unrelated to criminal activity, amicus would suppress the evidence.[1]

The State agrees that we should enunciate a new rule to govern undercover searches. It urges a rule that would validate any search carried out by undercover operatives unless the ruse adopted by the police involved moral or legal compulsion resulting in consent to entry when such consent would not have been given absent the compulsion. For example, under this test, gaining entry under the guise of a gas company investigator who is investigating a reported gas leak[2] or by claiming to have a valid warrant when in fact none is possessed would be invalid. All searches not approaching this egregious level of trickery would be constitutional.

We decline to adopt either of these rules. We adhere to the standards for evaluating the constitutionality of undercover operations that we enunciated in *Nix v. State,* 621 P.2d 1347 (Alaska 1981). In *Nix,* Officer Headlough accompanied Debbie Miller to her brother's apartment and both persons were admitted by a friend of Miller's brother. Headlough said nothing, but saw contraband from a burglary. We upheld the ruse against a contention that consent to the entry was not voluntary because it was not known that Headlough was a police officer. We first noted that "not every ruse or guise is permissible." *Id.* at 1349. We then stated:

[I]mplicit in the concept of voluntariness is a balance between the need for effective criminal law enforcement at one end of the scale and, at the other, "society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice." [*Schneckloth v. Bustamonte,* 412 U.S. 218, 224–25, 93 S.Ct. 2041, 2046–47, 36 L.Ed.2d 854, 861 (1973)] As we have observed in the context of entrapment, a special instance of police trickery, "[t]he question is really whether that conduct falls below an acceptable standard for the fair and honorable administration

---

**1.** This test has been proposed in varying forms by several commentators. *See* 2 W. LaFave, Search and Seizure § 8.2, at 680 (1978); White, *The Fourth Amendment as a Way of Talking about People: A Study of Robinson and Matlock,* 1974 Sup.Ct.Rev. 165, 229, 232; Com-

ment, *Governmental Deception in Consent Searches,* 34 U.Miami L.Rev. 57, 92–93 (1979).

**2.** *See People v. Jefferson,* 43 A.D.2d 112, 350 N.Y.S.2d 3 (1973).

of justice," *Pascu v. State,* 577 P.2d 1064, 1067 (Alaska 1978).

*Id.* We prefer this standard to the rules proposed by the State and amicus because it allows for case by case adjudication in this area. As our analysis will show, the facts of any particular case must be assessed to determine whether the undercover operation "falls below an acceptable standard for the fair and honorable administration of justice." *Id.*

In *Nix,* we found no violation of the standard of fairness. In so doing, we noted that there had been no "affirmative misrepresentation" regarding Headlough's identity. *Id.* Seizing upon this language, amicus distinguishes *Nix* by arguing that intelligent consent cannot be found where the undercover agent has affirmatively misrepresented both his identity and purpose. Since France and Wood did not reveal their identities as protection officers and acted in a manner which would lead to the conclusion that they were prospective land buyers, amicus concludes that fairness requires suppression of the evidence subsequently obtained under the search warrant.

We do not agree with this contention. First, nothing indicates that France or Wood acted in any manner approaching moral or legal compulsion. Assuming, as Guidry argues, that the inevitable conclusion to be drawn from France's questions was that he and Wood were prospective property buyers, this certainly does not amount to conduct that would morally or legally compel Guidry to grant the officers entry into his home. Second, the intention of the ruse was not to gain access to Guidry's house. It was meant to cover the officers' attempt to verify the license number on the truck and obtain a description of the property. Guidry initiated the entry by inviting France into the house. No evidence indicates that France's questions led ineluctably to Guidry's invitation, so that an intention to gain entry could be inferred. Then, despite France's expressed hesitation

to enter because of his muddy boots, Guidry pressed his invitation. We do not believe that France was required at that point to refuse entry and thus risk arousing Guidry's suspicion. Third, once France and Wood were inside the dwelling, neither of them exceeded the scope of the invitation. Each stayed near the door. The calf ribs were on the porch where they could readily be seen, and the bows and arrows were displayed openly inside the house within easy sight of the door. Finally, we note that this was not a random canvass of the homes in the neighborhood where the moose remains had been found. Before going to Guidry's house, France and Wood had received enough information pointing to Guidry as a prime suspect in the case to support the choice of Guidry and Brenham as parties upon whom to work a ruse.[3]

Therefore, we hold that, despite the affirmative misrepresentations involved in this case, the warrantless search of Guidry's house conducted by France and Wood pursuant to Guidry's invitation to enter was not unreasonable under Article I, section 14 of the Alaska Constitution.

## II. PRIVACY

Amicus argues that Alaska Constitution Article I, section 22 supports adoption of its proposed test. Article I, section 22, the privacy provision of the Alaska Constitution, states in pertinent part:

The right of the people to privacy is recognized and shall not be infringed.

Amicus notes that this section grants broad privacy protection to Alaskans that would not exist solely by virtue of the penumbras of other constitutional provisions, citing *State v. Glass,* 583 P.2d 872, 879 (Alaska 1978). Since Guidry was not involved in a "criminal enterprise" when France and Wood worked their ruse, amicus concludes that Guidry's reasonable expectation of privacy outweighs society's interests in effective law enforcement, thus requiring suppression of the evidence in question here.

---

**3.** *Cf. State v. Ahart,* 324 N.W.2d 317, 319 (Iowa 1982) (undercover search of a home is "patently unreasonable as an arbitrary intrusion when

it is based upon consent obtained by deception unless there is a justifiable and reasonable basis for the deception.")

We do not agree. We have already rejected amicus' test in the search and seizure context, and believe that *Glass* compels its rejection here. In *Glass,* we addressed the validity of electronic surveillance. We noted that "[i]n the context of law enforcement, it is true that the use of informers is a highly necessary tool in fighting crime." *Id.* at 880. We went on to state:

> Society is not willing to accept as reasonable the subjective expectation of one engaged in a conversation that it will not be repeated. *For generations, while not condoning the gossip or false friend, society has countenanced the repetition of private conversations.* The use of surreptitious electronic devices to broadcast or record conversations, however, is a development of recent vintage. We conclude that the expectation that one's conversations will not be secretly recorded or broadcast should be recognized as reasonable.

*Id.* (emphasis added). In this case, France and Wood were more like gossiping "false friends" than "false friends" who were equipped with electronic surveillance devices. Upon Guidry's invitation, they entered his house and saw the bows and arrows there, as well as the calf ribs on the porch. Although we do not so decide, perhaps if they had used concealed cameras to photograph the interior of the house surreptitiously without the benefit of a warrant allowing such conduct, that would approach the secret broadcasting and recording addressed in *Glass.* However, where, after entering the house at Guidry's behest, they merely observed the items in question and later repeated their observations to support the acquisition of a search warrant, we do not believe that they impermissibly invaded Guidry's expectation of privacy.[4]

4. *See Jones v. State,* 646 P.2d 243 (Alaska App. 1982), where the Court of Appeals discussed *Glass:*
> The case did not call into question the validity of a defendant's consent in dealing with a police informant who had obtained his confidence by ruse or misrepresentation. The distinction between the legitimacy of warrantless use of undercover informants and their testimony, on the one hand, and use of infor-

## III. JUDICIAL INTEGRITY

■ Guidry contends that judicial integrity requires that the evidence obtained in the search pursuant to the warrant be suppressed. He relies on the magistrate's statements that the ruse was a "Dan France facade," and that it "shocks the sensibility of this court."

Guidry cites *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), in which the forcible insertion of a tube in order to pump Rochin's stomach was found to be "conduct that shocks the conscience." *Id.* at 172, 72 S.Ct. at 209, 96 L.Ed. at 190. He also cites *State v. Sears,* 553 P.2d 907 (Alaska 1976), in which we stated that an exclusionary rule would be invoked in probation revocation proceedings in the presence of "police misconduct which shocks the conscience, or . . . of a nature that calls for the judiciary, as a matter of judicial integrity, to disassociate itself from the benefits derivable therefrom, . . . ." *Id.* at 914. Guidry notes that as recently as *State v. Sundberg,* 611 P.2d 44 (Alaska 1980), we have indicated the continued vitality in Alaska of the judicial integrity rationale behind the exclusionary rule. In *Sundberg,* though refusing to invoke an exclusionary rule, we noted that "[i]mplicit in our decision is the conclusion that considerations of judicial integrity do not dictate that an exclusionary rule should be invoked." *Id.* at 52 n. 25.

For the reasons we have expressed with respect to our conclusion that the conduct involved here did not fall below an acceptable standard for the fair and honorable administration of justice, we conclude that the conduct was not shocking and that judicial integrity does not require suppression of the fruits flowing from it.

**AFFIRMED.**

mation derived from warrantless participant monitoring, on the other hand, is reflected in the supreme court's ultimate disposition in *Glass,* which approved a superior court order suppressing the tape recording of a warrantless undercover transaction, but permitting the use in evidence of testimony by the informant concerning the drug sale.

*Id.* at 247.

RABINOWITZ, Justice, with whom COMPTON, Justice, joins dissenting.

I dissent. In my view, the magistrate erred in denying Guidry's motion to suppress.

As the majority notes, Wood and France, the Fish and Wildlife Protection officers involved in the case, changed into plain clothes so that Guidry would not be alerted to the fact of their official identities. For the same reason, they proceeded to Guidry's residence in Wood's personal vehicle. After they had arrived at Guidry's residence, they engaged Guidry in a conversation which would lead him to believe they were prospective property buyers. It is under the foregoing circumstances that Wood and France gained access to the porch of Guidry's home and ultimately to the interior of Guidry's residence.

The majority concedes that the only exception to the warrant requirement here is Guidry's purported consent to France's and Wood's entry into his house. In *Erickson v. State*, 507 P.2d 508, 515 (Alaska 1973), we said:

> [C]onsent to a search, in order to be voluntary, must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion, and is not lightly inferred. [Footnote omitted.]

I cannot agree that Guidry's consent was voluntarily given since it was obtained as a result of the ruses employed by France and Wood. In short, I would hold that intelligent consent cannot be found here in the circumstances where Wood and France affirmatively misrepresented both their identity and purpose.

I reach this conclusion under the rule articulated in *Nix v. State,* 621 P.2d 1347, 1349 (Alaska 1981). In that case we said in part:

> As we have observed in the context of entrapment, a special instance of police trickery, "[t]he question is really whether that conduct falls below an acceptable standard for the fair and honorable administration of justice." [Citation omitted.]

In my view, Wood's and France's questioned actions fall below acceptable standards for the fair and honorable administration of justice in Alaska. The well-established exception to the warrant requirement at issue here requires that, for consent to be valid, it must be voluntarily given by one with proper authority. *Nix v. State,* 621 P.2d at 1348. Contrary to the majority's assertion, absence of compulsion cannot be equated with free volition. "Knowing and intelligent" are generally regarded as essential concomitants to a valid consent, particularly when, as here, it involves the relinquishment of a constitutional right. As noted previously, we held in *Erickson v. State* that consent to a search must be intelligently given and is not lightly inferred. If law enforcement personnel gain entry to a home as they did here—by affirmative misrepresentation—I think it untenable to conclude that their presence was legitimated by "knowing" consent.[1]

In light of my conclusion that the absence of consent invalidated the search, it is unnecessary to discuss at length the privacy issue. I think it sufficient to state that Guidry's right to privacy under the Alaska Constitution was violated when Wood and

---

**1.** Concerning the "validating" features of the search, I have the following observations. First, the subjective intention of the officers should be given no weight in determining whether this entry was valid. They were hardly dragged into the house and could surely have found it within their creative powers to decline the admittedly tempting invitation. It is indisputable that they gained entry through a ruse which they voluntarily initiated. Whether or not the outcome was foreseen is irrelevant; they should have discontinued the act before crossing the threshold of the dwelling. Second, the "plain view" exception is irrelevant if the initial presence is unlawful. Finally, the fact that the officers had some information which led them to the Guidry dwelling is irrelevant if it alone would not have been sufficient to constitute probable cause. In my view, the court's opinion encourages officials with not quite enough information to risk crossing the line for additional evidence to "cure" the initial deficiency. Constitutional decisions and case law relating to searches and seizures are intended to discourage exactly this kind of conduct.

France gained entry to his home without his valid consent.[2]

**2.** Further, I think there is considerable merit in the amicus' "bright line" test governing search and seizure questions where undercover law enforcement agents are involved.