(May 28, 1992)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID MAYNARD, Appellant.—Crew III, J. Appeals (1) from a judgment of the County Court of Rensselaer County (Dwyer, Jr., J.), rendered September 17, 1987, upon a verdict convicting defendant of the crimes of murder in the second degree (two counts), robbery in the first degree and burglary in the first degree, and (2) by permission, from an order of said court, entered January 18, 1991, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction.

Defendant was indicted and charged with three counts of murder in the second degree (intentional murder, depraved indifference murder and felony murder) as well as robbery in the first degree and burglary in the first degree as the result of the death of Benjamin Friedman. After a jury trial, defendant was found guilty of depraved indifference murder and felony murder, as well as robbery in the first degree and burglary in the first degree. He was sentenced to concurrent prison terms of 25 years to life on the murder convictions and 8⅓ to 25 years on the convictions for robbery and burglary. Defendant appealed. Approximately three years after trial, defendant moved to vacate the judgment of conviction on the ground of newly discovered evidence. The motion was denied and this court granted permission to appeal.

The prosecution's evidence at trial indicates that, at about 7:30 A.M. on August 15, 1984, the naked, bound corpse of Friedman was found in his apartment in the City of Troy, Rensselaer County. Several leather belts, an electrical cord and a shirt were wrapped around his head, face and neck, and a yarmulke was found stuffed in his mouth. Additionally, his hands and legs were tied together behind his back with sheets, with the hand and leg bindings tied to each other. The sheets were found to be loosely tied, from which decedent could easily have extricated himself. The Medical Examiner testified that the cause of death was asphyxiation due to the bindings encircling decedent's head, thereby cutting off the blood supply to his brain. He further testified that the air supply to decedent's lungs had not been cut off and that the bindings

encircling decedent's neck and mouth played no part in his death. Rosalyn Abbott testified that in the early morning of August 13, 1984 defendant and Paul Palmer arrived at her residence with a back pack, pillow case and sleeping bag containing a number of personal items which were later identified as having belonged to decedent. She further testified that defendant stated he had been at the "queer's house" with Palmer and that Palmer had hit the "queer" too hard and had taken nothing of worth from the apartment. She further testified that defendant asserted that Palmer had ransacked the apartment.

Abbott's daughter Tara Showen testified that during August 1984 she, Palmer and defendant were residing with her mother. She further testified that at approximately 4:00 A.M. on August 13, 1984 Palmer and defendant came to her mother's residence with a pillow case and knapsack containing the personal items later identified as belonging to decedent. She testified that both men stated that they had been at the "queer's" house on 15th Street and that defendant stated that he had used a "sleeper hold" on the man and put something in the man's mouth. On cross-examination Showen acknowledged that she had told a number of people that she had been involved in the assault on the "queer" and it developed that in a tape-recorded conversation with Dwayne Tripp, she told Tripp that she had gone to decedent's house with her two sisters (Sissy Abbott and Trisha Zakrzewski) and brother-in-law (Joseph Zakrzewski) and that Joseph Zakrzewski had bound and killed decedent. It also developed that decedent's property was "fenced" by Abbott, her three daughters and Joseph Zakrzewski. Additionally, two of defendant's cousins, Austin Wilcox and Ronald Wilcox, testified that defendant told them that he had "mugged" and taken money from a "queer". Finally, Dean Desana testified that defendant admitted that he and Palmer had gone to decedent's apartment, where defendant had applied a sleeper hold on decedent and Palmer put a beanie in decedent's mouth.

Defendant introduced testimony from three members of decedent's synagogue that they had seen decedent at a religious service on Monday evening, August 13, 1984, and statements of two deceased members of the synagogue were read to the jury in which they claimed to have seen decedent at such service. One of those persons asserted that he had driven decedent home from the synagogue at approximately 8:45 P.M. on August 13, 1984. Accordingly, defendant claimed that he could not have murdered decedent in the early morning hours

of August 13, 1984 as asserted by the prosecution witnesses. Finally, defendant offered the testimony of a forensic pathologist who testified that decedent's death was the result of autoerotic asphyxia or accidental asphyxiation due to strangulation in the process of bondage.

On these appeals defendant contends that his conviction was contrary to the weight of the evidence. He asserts that the testimony of Abbott, Showen and Joseph Zakrzewski is not believable in view of the evidence implicating them in the murder. In particular defendant claims that Showen's testimony is totally unworthy of belief in light of the evidence of the tape-recorded conversation with Tripp in which she implicates herself and her family in the murder. Defendant further urges that the testimony of witnesses Ronald Wilcox and Austin Wilcox is particularly vague and that the testimony of Desana is not worthy of belief in that he is an admitted paid police informant. Furthermore, the claimed admission to Desana that defendant put a sleeper hold on decedent for three to five minutes and that Palmer placed a beanie in decedent's mouth is inconsistent with the Medical Examiner's testimony that the air supply to decedent's lungs had not been cut off. Defendant claims that the prosecution's evidence is wholly insufficient when viewed in comparison to the defense testimony demonstrating that decedent was alive on the evening of August 13, 1984 and that his death was the result of an autoerotic act.

In determining whether the verdict was against the weight of the evidence, we must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn therefrom and, in so doing, deference must be given to the fact finder's opportunity to view and observe the witnesses *(see, People v Bleakley,* 69 NY2d 490, 495). Here, the combined testimony of the prosecution's witnesses clearly permitted a finding of guilt. While Showen's tape-recorded statement implicating her family in the crime was clearly inconsistent with her trial testimony, the trier of fact apparently considered this impeachment testimony and rejected it *(see, People v Garcia,* 166 AD2d 199, *lv denied* 77 NY2d 906). And while the defense presented evidence that decedent was seen alive at a time subsequent to defendant's implication in his death and that his death resulted from a self-inflicted autoerotic act, the jury clearly rejected that evidence, which was its prerogative. Thus, we find that the jury's verdict is supported by the record evidence. We have considered defendant's remaining contentions

concerning asserted trial errors as well as the alleged defective Grand Jury proceedings and find them unpersuasive.

The more perplexing problem concerns defendant's motion to vacate his judgment of conviction. Prior to defendant's trial, Palmer was indicted for and convicted of murder, robbery and burglary in connection with decedent's death. On appeal from the denial of his application to vacate the judgment of conviction, we reversed and ordered a new trial because the defense had not been provided with the tape-recorded conversation between Showen and Tripp *(see, People v Palmer,* 137 AD2d 881, *lv denied* 71 NY2d 1031). At Palmer's retrial in November 1988 a theretofore unknown witness, Elaine Gagnon, testified on behalf of Palmer that in mid-August 1984 she had occasion to be with Sissy Abbott and the Zakrzewskis when they went to an apartment on 15th Street. The three went into the apartment building and left Gagnon outside, telling her to yell if the police came. After a short period of time Gagnon went upstairs and went into an apartment, where she observed a man gagged and tied to a chair. Gagnon then ran out of the apartment and down the stairs. She stopped at a street corner and watched Abbott and the Zakrzewskis along with Tara Showen, who had arrived upon the scene, carry items of personal property from the apartment and put them in their truck. In addition to the foregoing, Gagnon testified that the others told her that they had killed the individual in the apartment and threatened her with bodily harm if she ever revealed what she saw. It was for that reason that she had not revealed what she knew until the time of Palmer's retrial. At the conclusion of his retrial Palmer was acquitted of the murder charges, but convicted of robbery and burglary.

Approximately two years after Palmer's retrial counsel for defendant moved to vacate the judgment of conviction based upon discovery of Gagnon's testimony. The People opposed the motion upon the ground that such testimony was cumulative, that there was no probability that had it been received at defendant's trial the verdict would have been more favorable to defendant and that the motion was not made with due diligence after discovery of the testimony.

The first two contentions are easily disposed of. First, the evidence was clearly not cumulative. While Showen's out-of-court statement to Tripp was properly used for impeachment purposes, it was not evidence that Showen and her family were implicated in the murder *(see, People v Ferraro,* 293 NY 51, 56). In view of the fact that the other evidence in the case

tending to implicate Showen and her family was circumstantial, the direct evidence given by Gagnon can hardly be seen as cumulative.

Second, it is difficult to perceive that, had Gagnon's testimony been received at defendant's trial, it was not probable that the verdict would have been more favorable to defendant. We note that at Palmer's initial trial, as well as his retrial, an inculpatory statement given by him to the police was introduced against him. In spite of that very incriminating evidence, he was acquitted of murder following the testimony of Gagnon, testimony not adduced at his first trial wherein he was convicted of murder. In the case at bar, given the vague testimony of Austin Wilcox and Ronald Wilcox implicating defendant in the homicide, the fact that Desana was a paid informant who did not reveal his knowledge of defendant's complicity until some two years after learning of it, the testimony of persons who claimed to have been with decedent at a religious service after the time which the testimony of the prosecution witnesses indicated that defendant was with and presumably killed decedent, and the fact that Gagnon's testimony, in its important aspects, corroborated the statement Showen made to Tripp implicating herself and her family in the homicide, we believe that Gagnon's testimony would probably have resulted in a more favorable verdict for defendant.

The question distills to whether County Court abused its discretion in denying the motion on the ground that it was not made with due diligence. Defense counsel, in explanation of his delay in making the CPL 440.10 application, asserted that he was not assigned for postjudgment motion purposes until December 1988. He immediately ordered a transcript of Gagnon's testimony, which he did not receive until July 1989. Counsel then awaited receipt of the trial transcript, some 2,000 pages, which he did not receive until the latter part of 1989. Counsel then embarked upon a review of the trial transcript to determine whether the Gagnon testimony indeed constituted newly discovered evidence of a kind that would probably have altered the outcome of defendant's trial. Counsel, a sole practitioner, averred that from the time of receipt of all of the necessary transcripts he was engaged in a number of unrelated appeals and trial matters that made it impossible for him to complete his research and preparation of the CPL 440.10 application until December of 1990, two years after he was assigned for that purpose. The People's only assertion of prejudice is contained in their brief on appeal, in which they

allege that the delay may cause damage to their ability to call witnesses. We believe counsel's explanation for the delay was reasonable and that County Court's denial of the application based upon lack of due diligence was an abuse of discretion, particularly in view of the fact that the People demonstrated no prejudice because of the delay.

Mikoll and Mercure, JJ., concur.

Weiss, P. J. (concurring in part and dissenting in part). I fully concur with the majority in its holding that the judgment convicting defendant of the crimes of murder in the second degree, robbery in the first degree and burglary in the first degree should be affirmed.

It is with the decision to reverse the order denying defendant's CPL 440.10 motion to vacate the judgment of conviction that I disagree and respectfully dissent. My reasons are twofold. First, I do not agree that the testimony of Elaine Gagnon was of such nature as would insure "a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]). Gagnon was a 14-year-old girl at the time the crimes were committed. Testimony she gave four years later at Palmer's retrial was replete with inconsistences, errors, vagaries and speculation. She was uncertain whether the events occurred on August 8, 9, 10, 11, 12 or 13, 1984. She and her three companions had been driving around Rensselaer County from 2:00 P.M. until after darkness drinking three cases of beer and smoking marihuana all afternoon. Her testimony contradicted that of other witnesses. For example, Gagnon said she saw blood on the clothes of Joe Zakrzewski and Trisha Zakrzewski after they came out of the victim's house, yet not one other witness testified to the presence of blood, including the Medical Examiner, who testified that the victim had not bled. She said she saw the victim fully clothed tied to a chair, yet the body was found completely naked in his bed. She said he asked her to help him, yet he was found completely gagged. She had been convicted of crimes originating in shoplifting and was on probation at the time. She said she was under the influence of alcohol even when she ultimately disclosed the story to her attorney some four years later, after Paul Palmer's conviction.

In sum, I view her testimony to be wholly unworthy of belief, lacking in credibility and more likely the machinations of a young girl, herself already a mother at age 14, who was intoxicated and hallucinatory from marihuana at the time she allegedly was present on the day of the crimes. Moreover, it is

virtually impossible to rule out her motivation to help defendant, whom she said she knew and liked, or did not know, depending on which attorney was examining her. Moreover, County Court correctly held that Gagnon's testimony was cumulative of the evidence already given pertaining to the alleged involvement of the Abbott family and the Zakrzewskis in the crimes, all of which the jury had before it and rejected *(see, People v Seneci,* 133 AD2d 432, *lv denied* 70 NY2d 1011).

I similarly am unable to accept the argument that the "newly discovered evidence" was presented with due diligence. Gagnon's testimony was a matter of public record and certainly publicized in the media following Palmer's retrial in November 1988. The record shows that Eugene Grimmick, defendant's present counsel who made the subject motion, was himself in court during Palmer's retrial and, in fact, was about to be appointed to represent Gagnon during that trial. At that very time, he declined the appointment because *he had already been assigned as appellate counsel to represent defendant.* In addition, daily transcripts including Gagnon's testimony on Palmer's retrial had been prepared and were available to him. Grimmick already had accepted the assignment and had to be aware of the need to use Gagnon's testimony on behalf of this defendant. Defendant was under no disadvantage in his ability to discover or document Gagnon's testimony *(see, People v Hildenbrandt,* 125 AD2d 819, *lv denied* 69 NY2d 881; *People v Latella,* 112 AD2d 321, 323). Yet, despite all this, Grimmick failed to make the instant CPL 440.10 motion until December 1990, two full years later. I find the excuses offered unacceptable and would hold that defendant has failed to satisfy the due diligence requirement in the statute *(see, People v Fielder,* 154 AD2d 388). I would therefore affirm the order denying defendant's CPL 440.10 motion as well as the underlying judgment of conviction.

Ordered that the judgment is affirmed.

Ordered that the order is reversed, on the law, motion granted, judgment of conviction vacated and matter remitted to the County Court of Rensselaer County for a new trial.