THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* MICHAEL FERRARO, Appellant.

Argued April 20, 1944; decided June 8, 1944.

*John S. Knibloe* and *Samuel E. Chasin* for appellant. I. The People's cross-examination of their own witnesses and the trial court's rulings and instructions thereon, so clouded the issues, that defendant's rights were prejudiced. (*People v. Becker*, 210 N. Y. 274; *People v. Minsky*, 227 N. Y. 94; *People v. Purtell*, 243 N. Y. 273; *People v. Sellinger*, 265 N. Y. 149; *Bullard v. Pearsall*, 53 N. Y. 230; *Hickory v. United States*, 151 U. S. 303; *People v. Hickey*, 235 N. Y. 188; *Becker et al. v. Koch*, 104 N. Y. 394; *People v. Romano*, 279 N. Y. 392; *Jenkins v. 313–321 W. 37th St. Corp.*, 284 N. Y. 397; *Matter of Roge v. Valentine*, 280 N. Y. 268.) II. The errors committed on the trial and the inflammatory conduct and prejudicial statements of the Assistant District Attorney deprived the defendant of a fair trial. (*People v. Chin Sing*, 242 N. Y. 419; *People v. Rosenthal*, 286 N. Y. 482; *People v. Sobieskoda*, 235 N. Y. 411; *People v. Cummins*, 209 N. Y. 283; *People v. Davey*, 179 N. Y. 345; *People v. Wolf*, 183 N. Y. 464; *People v. Mull*, 167 N. Y. 247; *People v. Fielding*, 158 N. Y. 542; *People v. Esposito*, 224 N. Y. 370; *People v. Slover*, 232 N. Y. 264; *Stokes v. People*, 53 N. Y. 164; *People v. Altman*, 147 N. Y. 473; *People v. Davey*, 179 N. Y. 345; *People v. Marendi*, 213 N. Y. 600; *People v. Smith*, 172 N. Y. 210.)

*Leo S. Hagerty, District Attorney* (*John J. Kane* of counsel), for respondent. The direct examination of the People's wit-

nesses was fair, pertinent and in accordance with law and the substantial rights of the defendant were not prejudiced. (Code Crim. Pro. § 8-a.)

THACHER, J. The defendant was convicted of murder in the second degree and his conviction has been unanimously affirmed by the Appellate Division.

On March 7, 1943, one Antonio Briandi was shot with a revolver by the defendant in a barroom at the corner of Eagle and Spring Streets in the city of Buffalo. Within a few moments after the shooting the police found the defendant in his home, not far from the saloon. The defendant immediately gave himself up, stating: " I did it. I give myself up. He had been after me for three or four days, going to get me. I go in for a beer and when I go in the place he come after me with a gun and start shooting. * * * I did it. I am the one you are looking for. * * * He was after me with a gun and I had to protect myself. I went in the saloon for a glass of beer. He grabbed me and pulled his gun and started to shoot, and I pulled mine. I had to shoot."

A week before this occurrence, the defendant and the deceased and some others were engaged in a game called "boss", in which defendant had accused the deceased of cheating, and mad looks and bad words were passed, with the result that others requested each man to leave. A few days before the shooting the two men, again playing cards, engaged in an altercation in which the deceased called the defendant a name and attempted to hit him with a chair. At this time they were separated and the deceased thereupon called the defendant a foul name and said, " Before tomorrow night I am going to kill you."

On the evening of the defendant's arrest the police took his statement in the form of questions and answers. The statement was voluntary and was received without objection. He described the altercations to which reference has been made and stated that others had told him that the deceased wanted to kill him. He described the shooting as follows: " Q. When you walked into Perillo's saloon where was Briandi standing? A. Briandi was standing at the bar with his back to me. Q. Was that his position at the bar when you entered the saloon? A. As I entered the saloon Briandi was at the bar with his back to

me, then he turned and looked and came toward me. Q. How many feet was Briandi from you when he walked toward you and came to a halt? A. About one inch. Q. When Briandi came to a halt and you were close to him, approximately one inch, what was said by you or Briandi? A. Briandi said to me, ' What are you doing here? ' and he wanted to grab me by the front of my shirt, but I ward him off with my left arm, and he says to me, ' You miserable and good for nothing.' He immediately put his hand in his pocket, I don't know which pocket he put his hand. I now remember that he put his right hand in his right hand pocket and when I saw that he pulled his gun from his pocket, I took my revolver from the upper part of my left side pants. I pulled away and I shot him. Q. How many shots did you fire when you stepped back? A. I don't know how many times I shot. Q. How far away were you from Briandi when you fired the shot or shots? A. About five feet. Q. Did you fire the shot or shots first? A. I do not remember who shot first. Q. How many shots did he fire? A. Three, four or five. Q. Did you see Briandi fall to the floor? A. No, I did not. Q. What did you do after you fired a shot or shots from your gun? A. Someone jumped on me and took the revolver away from me. Q. Do you know the name of the person who took the gun from you? A. No. Q. Had you ever seen this person who took the gun from you before? A. No. Q. Before you left home you had this gun hid in the shanty, is that right? A. Yes. Q. And when you left home, knowing that you were going to the saloon, you took your gun with you didn't you? A. Yes. Q. You then proceeded to go to the saloon at Spring and Eagle Streets operated by Mr. Perillo, is that correct? A. Yes. Q. Why did you take your gun with you? A. To protect my life. Because I was told Mr. Briandi was a bad fellow and they made me understand that if he would ever meet me he would kill me. Q. What are the names of the persons that told you about Mr. Briandi? A. I don't know the names.''

A witness, Antonelli, called by the People testified that he saw the defendant come into the barroom through the front door and start talking to some people. He then saw the deceased walk toward the defendant from the other end of the

bar to within about a couple of feet of the defendant, which was only three feet away from where the witness sat. The deceased was facing toward the bar and the defendant was facing sideways along the bar. He saw the two men talking together but could not understand what they were saying. The testimony continued: " Then I seen Mike [the defendant] was motion with his hands, and I see he had his hands under here (indicating), and then shooting; and then when I hear the first and second shots I run outside." There were four other witnesses who were in the saloon at the time. None spoke English well and the testimony with respect to details shows some inconsistency. In the main, however, there is no substantial difference between their accounts and the accounts given by the defendant and the witness Antonelli.

The principal conflict among the eyewitnesses was upon the question of who shot first. The defendant claims that he shot in self-defense and only after the deceased reached for his gun. It is entirely clear, however, that, remembering Briandi's threat to kill him, defendant came armed to the tavern. He himself said: " When I went in for a beer he come after me and I beat him to it."

While the shot was no accident, the wound was in the left buttock and death was not the natural and necessary consequence of a shot aimed there. The men were so close to each other that the defendant, if he aimed to kill, would hardly have shot the deceased, a man weighing almost 200 pounds, in that spot. The cause of death was loss of blood from the severance of the femoral artery. When the two men finished shooting at each other, six bullets were recovered by the police and two others were located as having been fired into the ceiling of the barroom. Five were of .32 caliber — presumably fired from the weapon of the deceased; one of .38 caliber — presumably fired from the defendant's pistol — was found imbedded near the floor in the jamb of a doorway.

Upon these facts it is contended that the evidence was not sufficient to support the verdict of guilt, because intent to kill was not shown and because the defendant fired in self-defense. We may not consider the weight of the evidence on these questions. It was sufficient to present both questions to the jury

as questions of fact for their determination. However, these questions of fact were extremely close and were sharply contested upon the trial. In such a case we may not lightly assume that a plain error of law in the trial of the case did not affect the substantial rights of the defendant.

During the course of the trial the Assistant District Attorney confronted a number of his own witnesses, who were in the saloon when the shooting occurred, with statements they had made out of court and also with their testimony before the Grand Jury. These statements were regarded as more strongly indicative of defendant's guilt than the statements given by the witnesses on the trial. It was proper to use such statements to refresh the recollection of the witness or to impeach his statements on the witness stand insofar as they were in contradiction of a prior statement subscribed or sworn to (Code Crim. Pro. § 8-a); but it was quite improper to submit such statements to the jury as evidence of guilt. In charging the jury, the court said: " The District Attorney claims that some of the witnesses have testified during this trial somewhat differently than when before the Grand Jury; he claims also that the testimony differs substantially to the statements given to the police after the shooting. It is for you to recall just where this difference is, having in mind the testimony of each of these witnesses. It is for you to determine when there is such a difference as claimed whether you are to believe the testimony given in this trial or believe the statements made by the same witness testifying differently before the Grand Jury. The same rule applies as to the statements given to the police." Exception was taken to this part of the charge and the court was asked to charge " that the statements or testimony in the Grand Jury can only be used to criticize or challenge the witness's credibility and for no other purpose, and the reason for that is you don't have the whole statement or they don't have all of the testimony given at any particular time."

" The Court: Well, of course, I might if you strike out the latter part of your request. I am not going to charge that. You cannot ask the Court to charge as it is. I decline. If you stop before the last sentence, all right. Mr. Knibloe: All right, strike out the last sentence then. The Court: Certainly, ladies and gentlemen, it is the intention of the Court to charge

that you have a right to consider the testimony of these witnesses, the five patrons, customers of the tavern, as to their credibility and as to the examination and cross examination by counsel with reference to the alleged statements made before the Grand Jury and their personal statements taken at the police station as well as their testimony given in this trial. In other words most of these witnesses made certain statements which were in contradiction on either direct or cross examination of counsel to that which they made in either their own statements to the police or to the Grand Jury. I do not know whether I have made myself clear, but it all has to do with the credibility of these witnesses who testified to — Mr. Knibloe: In that connection I ask your Honor to charge that the evidence in the case — and the only evidence in the case — are the exhibits which include the statement made by the defendant, and which has been offered in evidence and the testimony which was given on the witness stand in this courtroom. The Court: Yes.''

The exception was well taken and the error was not cured by the later comments of the court.

Under other circumstances, and in a case free from doubt upon the main issue of guilt, such an error might be disregarded under section 542 of the Code of Criminal Procedure as not affecting the substantial rights of the defendant; but where, as in this case, extremely close questions of fact controlled determination of the plea of self-defense and the defendant's intent to kill, we may not say that such an error did not affect the substantial rights of the defendant involved in the jury's determination of guilt.

Other errors were urged upon us. These we do not consider because they are not clearly presented by rulings of the court to which proper exceptions were taken.

The judgments should be reversed and a new trial ordered.

LEHMAN, Ch. J., LOUGHRAN, RIPPEY, LEWIS, CONWAY and DESMOND, JJ., concur.

Judgments reversed, etc.