**STATE of Alaska, Petitioner,**

v.

**Jeron BATTS, Respondent.**

No.  A–9682.

Court of Appeals of Alaska.

Oct. 31, 2008.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez and Talis J. Colberg, Attorneys General, Juneau, for the Petitioner.

Margi A. Mock, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

We granted the State's petition for review to decide two issues that have arisen in Batts's case. The first issue is whether, when the defendant takes the stand at a criminal trial, Alaska Evidence Rule 412 allows the government to impeach the defendant's testimony with statements unlawfully obtained from the defendant during a custodial interrogation after the defendant invoked the right to silence or counsel under *Miranda v. Arizona*.[1] The second issue is whether Evidence Rule 412 is constitutional under Article I, Section 9 of the Alaska Constitution if the rule permits this type of impeachment.

We conclude that Alaska Evidence Rule 412 does permit the State to impeach a defendant's testimony with statements obtained in violation of the defendant's invocation of the *Miranda* right to silence or counsel. However, we conclude that this evidence rule is unconstitutional under the Alaska Constitution to the extent that it permits this impeachment in cases where the violation of *Miranda* was either intentional or egregious—by which we mean a violation that

would have been obvious to any reasonable police officer.

*Background facts and proceedings*

Jeron Batts was arrested on February 14, 2004, for the shooting death of Jeremiah Honeyblue. Following Batts's arrest, he was taken to the police station, where he was interviewed by two detectives. This interview was videotaped in its entirety, and (with a small exception that is explained below) it was also audiotaped.

Before the interview commenced, one of the detectives (Kristie Ratcliff) advised Batts of his *Miranda* rights, and Batts agreed to speak with the detectives.

Batts told the detectives that, at the time of his arrest, he had been driving near a Taco Bell restaurant on Muldoon Road, and that he had just come from a Williams/Mapco gas station. The following exchange then occurred:

> *Detective:* Okay. Where were you at prior to the Mapco?
>
> *Batts:* Prior to the Mapco?
>
> *Detective:* Uh-huh.
>
> *Batts:* Um, I'd rather not answer.
>
> *Detective:* I'm sorry?
>
> *Batts:* I'd rather not answer.
>
> *Detective:* So you—where you were comin' from before the . . .
>
> *Batts:* Yeah.
>
> *Detective:* Williams . . .
>
> *Batts:* Plead the Fifth.
>
> *Detective:* Mapco.
>
> *Batts:* Yeah, before [the] Mapco.
>
> *Detective:* Uh-huh.
>
> *Batts:* Plead the Fifth.
>
> *Detective:* So you don't want to answer that question?
>
> *Batts:* No.

(As can be seen, Batts uttered the words "Plead the Fifth" twice during this exchange. However, for simplicity's sake, in the discussion that follows we will refer to this exchange as the "first" time that Batts said, "Plead the Fifth".)

---

1.   384 U.S. 436, 468–69, 86 S.Ct. 1602, 1624–25,   16 L.Ed.2d 694 (1966).

The detectives continued the interrogation, but they turned to other issues. The following colloquy ensued, and Batts said "Plead the Fifth" for a second time:

*Detective:* So you have no idea why you're here?

*Batts:* Not really. I mean, when they say shots were fired, [and] said it was a vehicle like mine leavin' the area, and then that was it.

*Detective:* Okay. Is that your vehicle that you were stopped in?

*Batts:* Uh-huh.

*Detective:* Okay. Was there anybody else driving it tonight?

*Batts:* None of 'em were drivin'. [But] I had a friend with me.

*Detective:* Who was the friend that was with you?

*Batts:* Plead the Fifth.

*Detective:* So you won't tell us who the friend was that was with you?

*Batts:* Nah.

Batts did tell the detectives that his friend was black, but when Batts was asked to further describe him, he responded by saying, "Plead the Fifth."

The detectives continued the interview. Batts asserted his Fifth Amendment right to silence a total of eighteen times during the interview, each time by uttering the phrase, "Plead the Fifth." However, after the two instances quoted above, the detectives stopped asking Batts to clarify whether he was asserting his right to silence with regard to a specific question, or with regard to the interrogation in general.

During this same portion of the interview, Batts repeatedly told the police that he did not shoot Honeyblue, and that he had no grievance or ill-will toward Honeyblue. Batts asserted that the passenger in his car had shot Honeyblue—and that the shooting came as a complete surprise to Batts.

When the detectives expressed skepticism of Batts's story, Batts declared that he did not care what the detectives thought, and then Batts referred to his need to speak to a lawyer:

*Batts:* I don't really care what . . . you think [about my explanation]. I mean, all I know is I have to talk to . . .

*Detective:* You, you know who . . .

*Batts:* . . . a lawyer.

*Detective:* You know who you really need to be concerned with?

*Batts:* Who?

*Detective:* What the District Attorney thinks.

*Batts:* Uh.

*Detective:* 'Cause they're the one that files charges.

*Batts:* Man, I don't care about—they're like as bad as you guys, really.

The interview continued for a few more minutes, with Batts once more repeating his assertions that he had no ill-feelings toward Honeyblue and that the unnamed passenger in his car had unexpectedly shot Honeyblue. Then someone entered the interrogation room to announce that there was a phone call for the detectives. The detectives stopped the interview and turned off their tape recorder (although the video camera continued to run). The interview resumed ten minutes later:

*Detective:* The time is 9:45. We're back on tape. . . . Now, we haven't talked to you since we went off tape, is that correct? [Note: The videotape confirms this.]

*Batts:* Uh-huh. Yeah.

*Detective:* We read you your *Miranda* rights to begin with. You still recall all those rights?

*Batts:* Yes. Yes I do.

*Detective:* Do you wish to still talk to us now?

*Batts:* Yeah.

*Detective:* Okay. Um, a couple questions I want to [put] to you real quick is, uh, you saw this happen? What kind of gun did your friend have?

*Batts:* I don't know.

*Detective:* Was [it a] big gun? Little gun? Silver? Black?

*Batts:* I don't know, [I] honestly don't know. [His] back was to me. I, I just heard shootin'.

The interview continued for approximately another hour and twenty minutes. Throughout, Batts consistently maintained that his unnamed friend committed the homicide, and that he himself was innocent of wrongdoing.

Batts was ultimately indicted for first-degree murder and two counts of third-degree misconduct involving weapons.[2] As we explain in more detail below, Batts has now been tried twice for these crimes, and neither jury was able to reach a verdict on the murder charge.

Before Batts's first trial, he moved to suppress his statements to the police, arguing (1) that he did not freely and voluntarily waive his *Miranda* rights; (2) that his statements were taken in violation of his *Miranda* rights to counsel and silence; and (3) that his statements were involuntary. Superior Court Judge Philip R. Volland denied the motion in part and granted it in part.

Judge Volland rejected Batts's first argument; he ruled that Batts freely and voluntarily waived his *Miranda* rights after the police advised him of those rights. But the judge agreed that Batts had been interrogated in violation of his *Miranda* right to silence: he suppressed all of Batts's statements after Batts said "Plead the Fifth" for the third time—because, at that point, the officers stopped clarifying whether Batts had invoked his right to silence generally or was simply declining to answer a specific question. Judge Volland concluded that, even though the detectives had clarified Batts's first two declarations of "Plead the Fifth", Alaska law required the detectives to keep asking clarifying questions each and every time Batts made this declaration.

At Batts's first trial, Batts took the stand and gave an account of events that varied sharply from the account he gave the police. Batts testified that he was the one who shot Honeyblue, and that he did so in self-defense.

Batts asserted that Honeyblue had been a member of two gangs known as the "Boniface Clique" and the "Face–Side Killers," and that Honeyblue had threatened to kill him on several previous occasions. Batts further testified that, on the night of the shooting, he was in Honeyblue's neighborhood to pick up his date, Jessica McGee, who lived in a trailer two spaces away from Honeyblue's trailer. Batts said that he was walking toward McGee's trailer when Honeyblue drove up in a car, pointed a gun at him, and threatened to kill him "right where [he stood]." Batts testified that, in response to this threat, he pulled out his own gun and shot Honeyblue, and then he left the scene.

After Batts gave this testimony, the State sought to impeach Batts's claim of self-defense by playing the videotape of Batts's post-arrest interrogation—including the portions that had been suppressed by Judge Volland. The State relied on Evidence Rule 412(1)(B), which states (in pertinent part):

Evidence illegally obtained shall not be used [against the defendant in a criminal prosecution] over proper objection by the defendant . . . for any purpose except:

(1) a statement illegally obtained in violation of the right to warnings under *Miranda v. Arizona* [citation omitted] may be used in

. . .

(B) any prosecution, to impeach the defendant . . . who made the statement if the prosecution shows that the statement was . . . otherwise voluntary and not coerced, and [if the statement was] recorded, if required by law[.]

At Batts's first trial, Judge Volland denied the State's motion because he interpreted Evidence Rule 412(1)(B) as applying only to statements that are illegally obtained when the police fail to give proper *Miranda* warnings to the defendant. The judge concluded that Rule 412(1)(B) did not apply to cases where the police properly administer the *Miranda* warnings but then fail to honor the defendant's invocation of the rights to silence or counsel. Because that was the situation in Batts's case, Judge Volland concluded that the State could not use Batts's suppressed statements to impeach his trial testimony.

The jury was not able to reach a verdict on any count at Batts's first trial, and Judge Volland declared a mistrial.

**2.** AS 11.41.100(a)(1)(A), and AS 11.61.200(a)(1)    and (6), respectively.

Before Batts's second trial, Judge Volland reconsidered—and reversed—his ruling on the scope of Evidence Rule 412. This time, the judge concluded that Rule 412 did in fact allow the State to impeach a defendant with statements obtained in violation of the defendant's invocation of *Miranda* rights (not just statements obtained after the police failed to give proper warnings). But Judge Volland then held that Rule 412, interpreted in this fashion, was unconstitutional under the self-incrimination clause of the Alaska Constitution (Article I, Section 9).

At this point (*i.e.*, before Batts's second trial), the State filed a petition for review of Judge Volland's decision, but we denied the State's petition and the parties proceeded to the second trial.

At his second trial, Batts gave essentially the same testimony that he gave at his first trial. Again, the jury was unable to reach a verdict on the murder charge—although the jury found Batts guilty of one count of misconduct involving weapons (possession of a firearm with an altered serial number). Batts subsequently pleaded no contest to the remaining count of weapons misconduct (possession of a concealable firearm by a felon).

Following this second incomplete trial on the murder charge, the State again petitioned this Court to review Judge Volland's ruling. This time, we granted the petition and ordered briefing.

The State takes the position that Judge Volland's most recent interpretation of Evidence Rule 412 is correct—*i.e.*, that the rule allows the State to impeach Batts's testimony using the suppressed statements from the police interview—but the State argues that Judge Volland was wrong to hold that this rule is unconstitutional.

Batts, for his part, contends that Judge Volland's *initial* interpretation of Rule 412 was correct. That is, Batts argues that Rule 412 only authorizes the use of statements obtained after the police fail to properly administer *Miranda* warnings, and that the rule does not authorize admission of statements obtained after the police provide prop-

er *Miranda* warnings but then fail to honor a suspect's invocation of *Miranda* rights. Batts further asserts that if Rule 412 is interpreted in the manner proposed by the State, the rule is unconstitutional.

### Analysis

*With certain exceptions, Alaska Evidence Rule 412 allows impeachment of a defendant's trial testimony with statements obtained after the police fail to honor the defendant's Miranda rights to silence and counsel*

■ As explained above, Evidence Rule 412 allows a defendant to be impeached with statements "obtained in violation of the right to warnings under *Miranda*". The parties disagree as to the meaning of this phrase. Batts contends that this language should be interpreted literally—that it applies only to instances where the police fail to administer proper *Miranda* warnings to a suspect. The State, on the other hand, contends that this language encompasses not only instances where the police fail to adequately warn a suspect of the *Miranda* rights, but also instances where the police give adequate warnings but then fail to properly honor an invocation of those rights.

Phrased another way, the controversy is whether the Alaska Legislature (the author of Alaska Evidence Rule 412(1)(B)) intended Rule 412 to codify not only the United States Supreme Court's decision in *Harris v. New York*[3] but also the Supreme Court's later decision in *Oregon v. Hass*.[4]

*The decisions in Harris v. New York and Oregon v. Hass*

■ Statements obtained in violation of *Miranda* are normally inadmissible. But in *Harris v. New York*, the Supreme Court carved out an "impeachment" exception to this rule of exclusion.

In *Harris*, the advisement of *Miranda* rights was defective because the police failed to advise the defendant of his right to appointed counsel if he could not afford to hire

---

**3.** 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

**4.** 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

one.[5] The government conceded that, because of this flaw, Harris's statements were obtained in violation of *Miranda*, and the government made no attempt to use these statements in its case-in-chief.[6]

But after Harris took the stand and gave an account of events which contradicted the statements he made to the police, the trial judge allowed the government to impeach Harris with those prior inconsistent statements—although, in accordance with New York law,[7] the judge instructed the jury "that the statements attributed to [the defendant] could be considered only in [assessing the defendant's] credibility [as a witness] and not as [direct] evidence of guilt."[8]

The United States Supreme Court upheld this use of the defendant's statements for impeachment purposes. The Court conceded that some of what it had said in *Miranda* "[could] indeed be read as indicating a [complete] bar to [the] use of an uncounseled statement for any purpose", but the Court declared that any such comments in *Miranda* were *dicta* and "[could not] be regarded as controlling", so long as "the trustworthiness of the evidence satisfies legal standards".[9]

The Court then explained why it concluded that Harris's prior inconsistent statements to the police should be admissible:

> [Harris's] testimony in his own behalf ... contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing [his] credibility, and the benefits of this [impeachment] process should not be lost ... because of the speculative possibility that impermissible police conduct will be encouraged thereby.... [S]ufficient deterrence flows [from the fact that] the evidence in question is made unavailable to the prosecution in its case in chief.

Every criminal defendant is privileged to testify in his own defense, or refuse to do so. But that privilege cannot be construed to include the right to commit perjury. [Citations omitted] Having voluntarily taken the stand, [Harris] was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process....

The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances.

*Harris*, 401 U.S. at 225–26, 91 S.Ct. at 645–46.

Four years later, in *Oregon v. Hass*, the Supreme Court applied its holding in *Harris* to a case in which the defendant received proper *Miranda* warnings but the police failed to honor the defendant's ensuing request to contact an attorney.[10] The Supreme Court again emphasized that "the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances."[11]

*The legislative history of Alaska Evidence Rule 412*

As we explained above, the State asserts that the Alaska Legislature intended to codify the entirety of the *Harris/Hass* rule when it enacted the current version of Evidence Rule 412 in 2004, while Batts asserts that the legislature intended a narrower exception to the exclusionary rule: one that pertains only to evidence obtained when the police fail to give proper *Miranda* warnings (the situation presented in *Harris* ), and which does not cover evidence obtained when the police fail to honor a suspect's invocation of the right to silence or counsel (the situation presented in *Hass* ).

---

5. *Harris*, 401 U.S. at 224, 91 S.Ct. at 645.

6. *Id.*, 401 U.S. at 223–24, 91 S.Ct. at 645.

7. *See People v. Freeman*, 9 N.Y.2d 600, 217 N.Y.S.2d 5, 8, 176 N.E.2d 39, 41–42 (1961); *People v. Ferraro*, 293 N.Y. 51, 56, 55 N.E.2d 861, 863–64 (N.Y.1944); *Roge v. Valentine*, 280 N.Y. 268, 276–277, 20 N.E.2d 751, 754 (N.Y.1939).

8. *Harris*, 401 U.S. at 223, 91 S.Ct. at 644.

9. *Id.*, 401 U.S. at 225, 91 S.Ct. at 645.

10. *Hass*, 420 U.S. at 715, 95 S.Ct. at 1217.

11. *Id.*, 420 U.S. at 722, 95 S.Ct. at 1221.

■ The wording of the rule—in particular, the clause "obtained in violation of the right to warnings under *Miranda*"—appears to support Batts's interpretation. But the wording of the rule is not conclusive, because Alaska does not adhere to the "plain meaning" approach to statutory interpretation. Instead, Alaska courts apply a flexible approach which allows a court to look to the legislative history of a statute "even if its language is plain on its face"[12]—although "the plainer the language of the statute, the more convincing any contrary legislative history must be."[13]

Before the legislature amended Evidence Rule 412 in 2004, the rule allowed only a very limited use of voluntary statements obtained in violation of the right to warnings under *Miranda:* these statements could not be used over the defendant's objection in any criminal trial except a separate prosecution for perjury.[14]

In the 2004 legislative session, several legislators advocated amending the rule in response to an Anchorage criminal case, *State v. Wallner*.[15] The defendant in *Wallner* was charged with murdering his wife.[16] During a custodial interrogation, the police apparently continued to interrogate Wallner after he invoked his right to counsel, and (because of this) the superior court suppressed the statements that Wallner made during the ensuing questioning. At his trial, Wallner took the stand and gave an account of events that was quite different from his suppressed statements to the police.

Although the jury convicted Wallner even without hearing his contradictory statements to the police,[17] the legislature concluded (as a policy matter) that the State should have been allowed to use Wallner's pre-trial statements to impeach his trial testimony.[18]

In committee debate on this proposed amendment of Evidence Rule 412, the legislators did not explicitly discuss the distinction that is being litigated in the present appeal. That is, the legislators did not distinguish (1) statements obtained after the police fail to give the defendant proper *Miranda* warnings, from (2) statements obtained after the police fail to honor the defendant's invocation of the *Miranda* rights to silence or counsel. But the committee discussion, taken as a whole, shows that the legislators believed that the proposed amendment to Rule 412 would make both categories of statements admissible to impeach a defendant who took the stand.

For instance, Representative Ralph Samuels, one of the sponsors of the amendment, told his fellow legislators that the aim of the amendment was to adopt the impeachment rule that was followed in the federal courts and in the courts of some thirty other states.[19] Stephen Branchflower, who was then the director of the Office of Victims' Rights, likewise told the legislature that the proposed new version of Evidence Rule 412 was designed to allow impeachment of a defendant whenever the defendant gave testimony at trial that was inconsistent with the

**12.** *Curran v. Progressive Northwestern Ins. Co.*, 29 P.3d 829, 831 (Alaska 2001).

**13.** *Peninsula Marketing Ass'n v. State*, 817 P.2d 917, 922 (Alaska 1991).

**14.** The pertinent portion of the pre–2004 version of Rule 412 read: "Evidence illegally obtained shall not be used over proper objection by the defendant in a criminal prosecution for any purpose except [that] a statement illegally obtained in violation of the right to warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), may be used in a prosecution for perjury if the statement is relevant to the issue of guilt or innocence and if the [government] shows that the statement was otherwise voluntary and not coerced[.]"

**15.** See this Court's decision in *Wallner v. State*, Alaska App. Memorandum Opinion No. 5060 (March 22, 2006), 2006 WL 744269.

**16.** *Id.*, Memorandum Opinion No. 5060 at 1, 2006 WL 744269 at *1.

**17.** *Id.*, Memorandum Opinion No. 5060 at 5, 2006 WL 744269 at *3.

**18.** See the discussion of House Bill 349 (23rd Legislature) in the Minutes of the House Judiciary Committee for January 26, 2004, and the Minutes of the Senate Judiciary Committee for March 22, 2004.

**19.** Minutes of the Senate Judiciary Committee for March 22, 2004 (discussion of House Bill 349).

defendant's earlier statements to the police.[20] And House Judiciary Committee Chair Lesil McGuire stated that the proposed amendment would prevent defendants from using *Miranda* "as a sword". She declared that, under the amended version of Rule 412, defendants would no longer be free to take the stand at trial and "say whatever they want", secure in the knowledge that "the fact that they have made prior inconsistent statements will not be introduced or become part of the record for the jury to consider".[21]

Batts nevertheless argues that the legislature's aim was narrower. He points to remarks made by Senator Hollis French to the Senate Judiciary Committee during an explanation of the proposed amendment. In his remarks, Senator French discussed a hypothetical case in which the defendant did not receive proper *Miranda* warnings.[22] But elsewhere, during the same committee session, Senator French told the Judiciary Committee that the proposed amendment would allow the government to impeach a defendant with statements obtained in violation of the defendant's *Miranda* right to counsel "[if] the defendant takes the stand at his trial and tells a contradictory story." [23]

In sum, the legislative history of the 2004 amendment to Alaska Evidence Rule 412 demonstrates that the legislature intended to authorize impeachment of a defendant with statements suppressed because of a violation of the defendant's *Miranda* rights, whether that violation consisted of a failure to give proper warnings or a failure to honor the defendant's invocation of the right to silence or counsel.

It is true that the committee debates contain repeated references to the *"Harris"* rule. But given the context of the discussion and the examples cited above, we conclude that these references to the *"Harris"* rule should be read as shorthand references to the federal rule as it existed in 2004—that is,

to the *Harris* rule as expanded by the decision in *Hass*.

As explained above, the *Harris/Hass* rule does not distinguish between the two types of *Miranda* violations. In either case (*i.e.*, whether the *Miranda* violation consists of a failure to give proper warnings or a failure to honor the defendant's invocation of the right to silence or counsel), illegally obtained statements may be used to impeach a defendant who takes the stand (assuming that the statements are voluntary). During the debates regarding Evidence Rule 412 in the 2004 Alaska Legislature, no legislator suggested that the impeachment authorized by the amended rule should be limited to situations where the police failed to give proper *Miranda* warnings.

Thus, although the wording of Evidence Rule 412 might suggest that only statements obtained following improper *Miranda* warnings can be used to impeach a defendant, the legislative history of Rule 412 shows that legislators intended the rule to apply to all statements obtained in violation of *Miranda*.

*The constitutional limitations on Evidence Rule 412*

We now turn to the question of whether Evidence Rule 412 (as we have interpreted it here) violates the Alaska Constitution.

■ Obviously, Alaska Evidence Rule 412 does not violate the Federal Constitution— because, by definition, the United States Supreme Court's decisions in *Harris* and *Hass* are consonant with the Federal Constitution. But the Alaska Constitution's privilege against self-incrimination has been interpreted to impose greater restrictions on the government than the federal Fifth Amendment. As our supreme court explained in *Munson v. State*,

> While ... the language of [Article I, § 9] is "virtually identical" to the wording of the Fifth Amendment [to] the United

---

**20.** Minutes of the House Judiciary Committee for January 26, 2004, and Minutes of the Senate Judiciary Committee for March 22, 2004 (discussion of House Bill 349).

**21.** Minutes of the House Judiciary Committee for January 26, 2004 (discussion of House Bill 349).

**22.** Minutes of the Senate Judiciary Committee for March 31, 2004 (discussion of House Bill 349).

**23.** Minutes of the Senate Judiciary Committee for March 31, 2004 (discussion of House Bill 349).

States Constitution, ... we have interpreted § 9 more broadly than the [United States] Supreme Court has construed the Fifth Amendment [to] the Federal Constitution. *Scott v. State,* 519 P.2d 774, 785 (Alaska 1974). In so doing, we noted our "responsibility to depart whenever necessary from constitutional interpretations enunciated by the United States Supreme Court and to develop rights and privileges under the Alaska Constitution in accordance with our own unique legal background." *Id.* at 783. We [further noted that] "[w]e are not bound to follow blindly a federal constitutional construction of a fundamental principle if we are convinced that the result is based on unsound reason or logic." *Id.*

More recently, in *State v. Gonzalez,* 825 P.2d 920 (Alaska App.1992), the court of appeals expressed hesitation to blindly adhere to changes in federal constitutional law where unexpected decisions of the Supreme Court "have forced a serious reevaluation of ... fundamentals." *Id.* at 931 (internal citations omitted). Ultimately, the court [of appeals] concluded that "[t]he United States Supreme Court's decisions interpreting the fifth amendment do not decide the meaning of the Alaska privilege, and similarity in language does not make the United States Supreme Court the primary interpreter of article I, § 9." *Id. Munson,* 123 P.3d 1042, 1049 n. 48 (Alaska 2005).

■ As noted in this passage from *Munson,* when Fifth Amendment decisions of the United States Supreme Court "[force] a serious reevaluation of ... fundamentals", the courts of this state are obliged to consider whether the self-incrimination clause of the Alaska Constitution should be interpreted to provide greater protection than its federal counterpart. The United States Supreme Court's decisions in *Harris* and *Hass* rest on "a serious reevaluation" of two competing fundamental values: (1) preservation of the *Miranda* protections by employing the exclusionary rule to deter the police from violating *Miranda,* versus (2) preservation of the integrity of the judicial process against the

threat that potential perjury will go unchallenged because the impeaching evidence has been suppressed.

In *Harris* and *Hass,* the Supreme Court weighed these two competing values and concluded that, when a defendant chooses to testify at trial, the value of enforcing *Miranda* through application of the exclusionary rule is less important than the value of preserving the integrity of the fact-finding process at the trial. The Court declared that defendants should not be allowed to use "[t]he shield provided by *Miranda*" as "a license to [commit] perjury [to support] a defense, free from the risk [that they would be confronted] with [their] prior inconsistent utterances".[24]

As we explained in the preceding section of this opinion, the Alaska Legislature intended the current version of Evidence Rule 412 to embody this same balancing of the two competing interests.

But even before the legislature amended Evidence Rule 412, the rule already codified the concept that the value of deterring police misconduct through the exclusionary rule was sometimes outweighed by the competing value of deterring perjury. The pre–2004 version of Evidence Rule 412 (the version written by the Alaska Supreme Court) was also based on a weighing of these two competing values—although the balance struck in this earlier version of the rule was different from the *Harris/Hass* balance that is now codified in the current rule.

Under the pre–2004 version of Rule 412, if the government obtained statements from the defendant in violation of *Miranda,* the government was barred from using those statements to impeach the defendant's testimony at trial, but the statements could be used against the defendant if the government initiated a separate perjury prosecution against the defendant. In other words, defendants could testify at trial "free from the risk [that they would be confronted] with [their] prior inconsistent utterances", but these defendants *would* be subject to the risk that the government could then prosecute them for perjury.

---

**24.** *Harris,* 401 U.S. at 226, 91 S.Ct. at 646.

The fact that the Alaska Supreme Court enacted a version of Evidence Rule 412 that allowed *any* use—even this limited use—of statements obtained in violation of *Miranda* strongly suggests that the self-incrimination clause of the Alaska Constitution does not constitute a total bar to the use of such statements.

We acknowledge that the supreme court's promulgation of a court rule does not constitute a formal judicial declaration that the rule is constitutional. The supreme court might later conclude, following litigation, that the rule they adopted was in fact unconstitutional in one or more respects. But just as statutes enacted by the legislature are entitled to a presumption of constitutionality,[25] so too the court rules promulgated by our supreme court in their legislative capacity (pursuant to Article IV, Section 15 of the Alaska Constitution) are entitled to a presumption of constitutionality.[26]

■ For this reason, we must presume that the Alaska Constitution does not require complete suppression of statements obtained in violation of *Miranda*—and that, at the least, it is constitutional for the government to rely on these statements as the basis for a later perjury prosecution against a defendant who testifies at trial.

*The method of analysis adopted by the Alaska Supreme Court in Sears, Elson, and Waring*

The next question is whether, consistent with the Alaska Constitution, statements obtained in violation of *Miranda* can be used in the underlying criminal trial itself to impeach a defendant who takes the stand.

It is true that the supreme court's version of Evidence Rule 412 (*i.e.*, the pre–2004 version of the rule) did not authorize this use of statements obtained in violation of *Miranda*. But we do not believe that this former version of Rule 412 necessarily defined the outermost limit of the permitted use of such statements. Rather, the Alaska Supreme Court has repeatedly declared that the scope of the Alaska exclusionary rule will vary in different contexts—and that the extent of the required exclusion of evidence in any particular context will hinge on a weighing of society's competing interests.

In *State v. Sears*, 553 P.2d 907 (Alaska 1976), the supreme court declared that the exclusionary rule has two main purposes: (1) the "deterrence of unconstitutional methods of law enforcement", and (2) the preservation of judicial integrity by ensuring that the courts are not "made party to lawless invasions of the constitutional rights of citizens". *Id.* at 912.[27] But the supreme court also indicated that these purposes are not always paramount. Rather, the question of whether the exclusionary rule should be applied in a particular legal context hinges on a balancing of (1) the degree to which application of the exclusionary rule can be expected to deter police misconduct and (2) the degree to which the integrity of the judicial system would be compromised by the use of the illegally obtained evidence, versus (3) the need to use the illegally obtained evidence to further other important societal purposes. *Id.* at 912–13.

In *Sears*, the supreme court engaged in this balancing process and concluded that evidence obtained during an illegal search can be used in a probation revocation proceeding—unless the search constituted shocking misconduct, or unless the police carried out the illegal search knowing that the target of their activities was a probationer (because, in such circumstances, application of the exclusionary rule would significantly deter unlawful searches and arrests directed at probationers). *Id.* at 914.

Six and a half years later, in *Elson v. State*, 659 P.2d 1195 (Alaska 1983), the supreme court applied this same balancing test and concluded that illegally obtained evidence could be used at a defendant's sentencing—because "the needs of the judicial system in sentencing proceedings outweigh the

---

**25.** *Bonjour v. Bonjour*, 592 P.2d 1233, 1237 (Alaska 1979).

**26.** *DeNardo v. ABC Inc. RVs Motorhomes*, 51 P.3d 919, 928 (Alaska 2002).

**27.** Quoting *Terry v. Ohio*, 392 U.S. 1, 13, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968).

possible benefits of applying the exclusionary rule [to sentencing proceedings]." *Id.* at 1202. Again, the supreme court stated that the exclusionary rule *would* be applied if the evidence was obtained as a result of "gross or shocking police misconduct", *id.* at 1205, or if the police engaged in an unlawful search or seizure knowing at the time that the suspect was facing trial or sentencing on other charges, *id.* at 1204 n. 28.

Later that same year, in *Waring v. State*, 670 P.2d 357 (Alaska 1983), the supreme court decided that evidence obtained in violation of one co-defendant's Fourth Amendment rights could be used in the prosecution of the other co-defendants. The court reasoned that when police officers conduct searches or seizures of an individual's person or property, they generally act "for the purpose of prosecuting that individual, rather than for the purpose of prosecuting a co-defendant"—and that, for this reason, the purposes of the exclusionary rule are generally satisfied by exclusion of the resulting evidence "[from] the trial of the defendant whose rights were violated." *Id.* at 361.

Employing the same balancing analysis used in *Sears* and *Elson*, the supreme court concluded that evidence obtained in violation of one defendant's rights would generally be admissible at a co-defendant's trial—because application of the exclusionary rule in this context would not add measurably to the exclusionary rule's deterrent effect, and it would defeat society's need for reliable evidence when assessing the co-defendant's guilt or innocence. *Id.* at 361–62. Again, however, the supreme court cautioned that the exclusionary rule *would* be applied at a co-defendant's trial if the evidence was obtained as a result of "gross or shocking misconduct", or if the police engaged in a deliberate violation of the other person's rights for the purpose of obtaining evidence to prosecute that co-defendant. *Id.* at 362–63.

*Assessing the constitutionality of Evidence Rule 412 using the analysis adopted by the Alaska Supreme Court in Sears, Elson, and Waring*

■ The supreme court's decisions in *Sears*, *Elson*, and *Waring* illuminate the method of analysis we should employ when determining whether the Alaska exclusionary rule should be applied to prohibit the impeachment use of statements that were obtained in violation of a defendant's *Miranda* rights. We must assess the degree to which application of the exclusionary rule can be expected to deter police misconduct and the degree to which the integrity of the judicial system would be compromised by the use of the illegally obtained evidence, and then weigh these considerations against the need to protect the judicial process against the threat that potential perjury will go unchallenged because the impeaching evidence has been suppressed.

One important factor in this analysis is an examination of the presumed police motivation for engaging in over-zealous interrogation of a suspect.

As we explained above, the supreme court's decisions in *Sears*, *Elson*, and *Waring* were based in large measure on the court's conclusion that police officers generally do not investigate a suspect's potential criminal activities for the purpose of revoking the suspect's probation in another case, or for the purpose of influencing the suspect's sentence, or for the purpose of obtaining the criminal conviction of someone other than the suspect. Rather, in the main, the police investigate a suspect's potential criminal activities for the purpose of determining whether the suspect should be charged with the crime(s) under investigation and, if the answer is yes, for the purpose of obtaining evidence to prove the suspect's guilt at a criminal trial. Thus, the supreme court concluded, the deterrent effect of the exclusionary rule would not be appreciably diminished by allowing the government to use illegally obtained evidence for one of these three ancillary purposes.

But the use of statements obtained in violation of *Miranda* at the defendant's underlying criminal trial—even if this use is limited to impeachment of a defendant who takes the stand—presents a much closer issue. We say this because, unlike the legal contexts presented in *Sears*, *Elson*, and *Waring* (*i.e.*, the use of illegally obtained evidence at a probation revocation hearing, or at a sentenc-

ing hearing, or at someone else's criminal trial), the use of statements obtained in violation of *Miranda* to impeach a defendant's trial testimony is more closely related to the main purposes for which the police conduct custodial interrogations.

It is reasonable to assume that, generally speaking, when police officers interrogate a suspect following an arrest, they hope to get the suspect to confess or, at least, to make significant incriminatory admissions—so that these incriminatory statements can be used to prove the suspect's guilt at trial. The officers do not act with the primary purpose of obtaining statements that might be used to impeach the suspect in the event that (1) the suspect is ultimately charged with a crime based on independent evidence (*i.e.,* evidence apart from the statements obtained during the interrogation), and (2) the case goes to trial, and (3) the suspect takes the stand at trial, and (4) the suspect offers an account of events that varies from the statements given earlier to the police.

Nevertheless, it is reasonable to assume that *one* of the reasons the police conduct post-arrest interrogations is to try to get suspects to commit to one version of the facts. Even if that version of the facts is not self-incriminatory, the government will still obtain the advantage of pinning the suspect down to a particular version of events—thus making it more difficult for suspects to change their story after they get the chance to examine all the police reports and consult a defense attorney.

In other words, with regard to the admissibility of statements obtained in violation of *Miranda,* the police will undoubtedly be deterred from misconduct by the prospect that the defendant's statements will be excluded from the government's case-in-chief—but this deterrent effect will be significantly enhanced if the government is also precluded from using the defendant's statements to impeach the defendant's testimony.

Moreover, experience has shown that when courts circumscribe the reach of the *Miranda* exclusionary rule, police agencies ad-

just their training and their investigative tactics to take advantage of the change. A prime example of this was presented to the United States Supreme Court in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004).

In *Seibert,* the record showed that officials of the local police department consciously decided to take advantage of the Supreme Court's earlier decision in *Oregon v. Elstad*[28] by instructing officers that, during custodial interrogations, they should refrain from giving *Miranda* warnings until the suspects had made as many self-incriminating statements as possible—at which point, the officers were to give *Miranda* warnings and then have the suspects repeat their incriminating statements.[29]

What this suggests is that, if we ratify the constitutionality of Evidence Rule 412, our decision will to some degree encourage police officers to willfully continue custodial interrogations after a suspect has invoked the right to silence or the right to counsel. The police will know that the resulting statements can at least be used to impeach the defendant's testimony at trial—and, perhaps just as good from the government's point of view, that the existence of these statements may deter the defendant from taking the stand.

Against this significant reduction in the deterrent effect of the exclusionary rule, we must weigh society's interest in protecting the judicial process against the threat that potential perjury will go unchallenged because the evidence that would impeach the testimony has been suppressed.

Batts's case presents an example of why this societal interest is so important. Batts has been tried for murder twice, each trial ending in a hung jury. At both trials, Batts testified that he was the one who shot Honeyblue, that he did so intentionally, and that he acted in self-defense. This account of events is substantially different from—indeed, irreconcilable with—the account that Batts gave to the detectives who interviewed him following his arrest.

---

**28.** 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

**29.** *Seibert,* 542 U.S. at 604, 610 n. 2, 124 S.Ct. at 2606, 2609 n. 2.

We do not say that Batts has committed perjury at his criminal trials. His trial testimony may be true, and he may have lied to the detectives (out of fear, or for some other reason). But the fact that Batts gave the detectives such a different version of events is surely something that jurors should be aware of when they assess the credibility of Batts's claim of self-defense. As the United States Supreme Court declared in *Harris*, a defendant who "voluntarily take[s] the stand [is] under an obligation to speak truthfully", and the defendant's testimony should be subjected "[to] the traditional truth-testing devices of the adversary process".[30]

As we explained above, even the pre–2004 version of Evidence Rule 412 attempted to address this concern—by allowing the government to use statements obtained in violation of *Miranda* in a separate prosecution for perjury. The possibility of a later perjury prosecution can reasonably be expected to deter some instances of false testimony by criminal defendants. However, the deterrence value of a future perjury prosecution diminishes in direct proportion to the amount of imprisonment that the defendant faces if found guilty at trial.

Under Alaska law, perjury is a class B felony with a maximum punishment of 10 years' imprisonment.[31] The possibility of serving up to 10 years in prison for giving false testimony loses much of its deterrent force if a defendant is being prosecuted for an offense that carries a much greater penalty—for instance, the unclassified felony of first-degree murder, which carries a maximum penalty of 99 years.[32] In other words, the possibility of a later perjury prosecution loses its force to deter perjury in precisely those cases where society's interest in deterring perjury is greatest.

The final parameter to be considered is the preservation of judicial integrity—making sure that the courts are not "made party to lawless invasions of the constitutional rights of citizens".[33]

In this context, the phrase "lawless invasions of . . . constitutional rights" does not encompass all police conduct that violates the constitution. Rather, as used by our supreme court in *Sears*, *Elson*, and *Waring*, this phrase refers to "intentional", "gross", or "shocking" police misconduct.[34] See also the concurring opinion of Justice Connor in *Dimmick v. State*, 473 P.2d 616, 629 (Alaska 1970), where he advocated the position that, regardless of the normal limits on the application of the exclusionary rule, the rule should still be applied to all cases of "police conduct which is intentionally or flagrantly illegal".

To summarize our analysis of Evidence Rule 412: Because Rule 412 authorizes the government to impeach testifying defendants with statements obtained in violation of *Miranda*, Rule 412 significantly weakens the exclusionary rule's deterrent effect on police violations of *Miranda*. At the same time, however, Rule 412 significantly advances the societal value of preserving judicial proceedings against the threat of potential perjury—because the cross-examination authorized by Rule 412 provides a far better mechanism for deterring or detecting potential perjury in serious felony cases than the separate perjury prosecutions authorized by the previous version of the rule.

Across the whole spectrum of *Miranda* violations encompassed by Evidence Rule 412, we find these two competing values to be fairly evenly balanced. That being so, the presumption of constitutionality means that we should uphold the constitutionality of the rule. However, we believe that the goal of deterrence is paramount in two situations: when the police intentionally violate *Miranda*, and when the police engage in interrogation (even in good faith) that any reasonable police officer would know violates *Miranda*. Accordingly, we conclude that

---

30. *Harris,* 401 U.S. at 226, 91 S.Ct. at 646.

31. AS 11.56.200(c) (perjury is a class B felony) and AS 12.55.125(d) (with certain exceptions not pertinent here, the maximum term of imprisonment for a class B felony is 10 years).

32. AS 12.55.125(a).

33. *Sears,* 553 P.2d at 912.

34. *See Sears,* 553 P.2d at 914, *Elson,* 659 P.2d at 1205, and *Waring,* 670 P.2d at 362–63.

Evidence Rule 412 is unconstitutional in part.

We hold that Article I, Section 9 of the Alaska Constitution forbids the use of statements obtained in violation of *Miranda* if the *Miranda* violation was either intentional or egregious. For this purpose, a *Miranda* violation is "intentional" if the officer conducting the interrogation knew that further questioning would violate *Miranda* but the officer consciously chose to continue. Even if a *Miranda* violation is not intentional (as defined in the preceding sentence), a *Miranda* violation is "egregious" if the violation would have been apparent to any reasonable police officer.

To the extent that Evidence Rule 412 allows the government to impeach a testifying defendant with statements obtained as a result of an intentional or an egregious *Miranda* violation, the rule is unconstitutional. In such circumstances, there is an unacceptable diminishment of the salutary function of the exclusionary rule. The police must not be allowed to make violation of *Miranda* a tactic, nor should the government be allowed to profit from a *Miranda* violation that no reasonable police officer would have committed.

On the other hand, Evidence Rule 412 is constitutional to the extent that it authorizes the government to impeach a testifying defendant with statements obtained as a result of *Miranda* violations that are neither intentional nor egregious—that is, *Miranda* violations that occur even though the interrogating officers are acting in good faith and are making reasonable efforts to comply with *Miranda*.

*The limited use of evidence admitted under Evidence Rule 412*

We need to address one more aspect of this topic: the limited purpose for which evidence of a defendant's prior statements is admissible under Evidence Rule 412.

As explained above, the legislative history of Rule 412 demonstrates that the Alaska Legislature intended to codify the rule of *Harris* and *Hass*—the rule followed in the federal courts. But if we were simply to construe Rule 412 as allowing the government to introduce evidence of a defendant's prior inconsistent statements, our law would be more favorable to the government than the corresponding federal law.

■ This stems from the fact that, under Alaska law, evidence of a witness's prior inconsistent statements is admissible not only for whatever doubt it may cast on the witness's trial testimony, but also as substantive evidence in its own right. *See Beavers v. State*, 492 P.2d 88, 94 (Alaska 1971), and the Commentary to Alaska Evidence Rule 801(d)(1)(A), third paragraph.

Federal law, on the other hand, adheres to the common-law rule: a defendant's prior inconsistent, unsworn statements given during police interrogation can be used for impeachment purposes only. That is, this evidence is not admissible to prove the truth of any matters asserted, but only to the extent that it assists the jury in evaluating the credibility of the defendant's trial testimony.[35]

This same rule of limited admissibility was applied in *Harris*, which was litigated under New York evidence law. As recounted by the Supreme Court, the trial judge in *Harris* instructed the jury "that the statements attributed to [Harris] could be considered only in [assessing Harris's] credibility [as a witness] and not as [direct] evidence of [his] guilt." [36]

The jury in *Hass* received a similar instruction [37] because Oregon also adheres to the common-law rule: a witness's prior inconsistent statements are admissible for impeachment purposes only.[38]

**35.** Stephen A. Saltzburg, Michael M. Martin, and Daniel J. Capra, *Federal Rules of Evidence Manual* (9th ed.2006), § 801.02[3][a], Vol. 4, p. 801–28.

**36.** *Harris*, 401 U.S. at 223, 91 S.Ct. at 644.

**37.** *Hass*, 420 U.S. at 717, 95 S.Ct. at 1218.

**38.** *See State v. Derryberry*, 270 Or. 482, 528 P.2d 1034, 1036–38 (1974); *Davis v. Clackamas County*, 205 Or.App. 387, 134 P.3d 1090, 1095 (2006).

The legislative debates regarding Evidence Rule 412 contain no explicit discussion of this distinction between the law of Alaska and the law of these other jurisdictions. But the legislative debates do contain express assertions that the legislators intended to codify the rule of *Harris*. Indeed, we note that Representative McGuire, the chair of the House Judiciary Committee, stated that even though House Bill 349 was silent on this subject, she "assume[d] that any judge would make it clear to the jury that they [could] only take the [defendant's prior] statements into account for impeachment purposes, not [for] the question of guilt or innocence." [39]

■ We accordingly hold that, when evidence of a defendant's prior statements is admitted under Evidence Rule 412, this evidence can be used only for impeachment purposes—*i.e.*, only for whatever relevance it may have to assessing the credibility of the defendant's trial testimony. This evidence may not be used as substantive evidence—*i.e.*, as independent proof of any fact.

### The admissibility of one portion of Batts's post-arrest interview with the detectives

We have already generally described Batts's post-arrest interview with the detectives. For *Miranda* purposes, the interview can be divided into four parts—of which the superior court suppressed three.

The first part consists of the portion of the interview from its beginning through the part where Batts said "Plead the Fifth" for the first two times, and the detectives clarified each time that Batts was merely declining to answer a particular question, rather than seeking to terminate the interview. (The superior court ruled that this part of the interview was admissible.)

The second part consists of the portion of the interview where Batts continued to answer, "Plead the Fifth" to various questions, but the detectives stopped asking Batts to clarify his intention (*i.e.*, stopped asking him to specify whether he was declining to an-

swer a particular question or whether, instead, he wished to terminate the interview).

The third part consists of the portion of the interview that begins with Batts's reference to an attorney and that continues up to the point where the interview was interrupted for approximately ten minutes.

Finally, the fourth part consists of the portion of the interview after the detectives returned to the interrogation room and reminded Batts of his *Miranda* rights, and Batts expressed his wish to continue talking to the detectives.

With respect to whether the third and fourth parts of the interview are admissible to impeach Batts (should he take the stand at his next trial), we must remand Batts's case to the superior court so that the superior court can apply the test that we have announced here—*i.e.*, so that the court can determine whether the violation of Batts's *Miranda* rights was either intentional or egregious.

■ However, with respect to the second part of the interview—*i.e.*, from the time when the detectives stopped asking Batts to clarify the phrase, "Plead the Fifth", until the time when Batts referred to an attorney—the record and the law are clear enough to allow us to conclude that Batts's statements are admissible under Evidence Rule 412.

When Judge Volland ruled that this part of the interview should be suppressed, he relied on the rule announced by the Fourth Circuit in *United States v. Riggs*, 537 F.2d 1219 (4th Cir.1976). Under the *Riggs* rule, whenever a suspect makes an ambiguous or equivocal statement concerning the right to remain silent, all further interrogation must cease until the police clarify the suspect's desires. [40] Judge Volland concluded that the *Riggs* rule was most consistent with the Alaska Constitution because, in *Hampel v. State*, 706 P.2d 1173 (Alaska App.1985), this Court applied essentially the same rule to a suspect's ambiguous or equivocal statements regarding the right to an attorney. [41]

---

**39.** Minutes of the House Judiciary Committee for January 26, 2004 (discussion of House Bill 349).

**40.** *Riggs,* 537 F.2d at 1222.

**41.** *Hampel,* 706 P.2d at 1180.

Despite this Court's decision in *Hampel*, it remains debatable whether the *Riggs* rule accurately represents Alaska law on this subject.

First, the *Riggs* rule is no longer good federal law. In *Davis v. United States*, 512 U.S. 452, 461–62, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994), the United States Supreme Court rejected this rule and, instead, adopted the rule that police officers are obliged to stop a custodial interrogation only if the suspect makes a statement that, under the circumstances, a reasonable police officer would understand to be an unequivocal invocation of the suspect's rights.

Second, in the unpublished case of *State v. Munson*, Alaska App. Memorandum Opinion No. 4494 (November 21, 2001), 2001 WL 1477918, this Court decided that the *Hampel* restriction applied only to ambiguous or equivocal invocations of the right to counsel, and that it did not apply to ambiguous or equivocal invocations of the right to silence. *Id.*, Memorandum Opinion No. 4494 at pages 14–19, 2001 WL 1477918 at *7.

Four years later, this Court's decision was reversed by the Alaska Supreme Court in *Munson v. State*, 123 P.3d 1042 (Alaska 2005). However, the supreme court did not decide whether the *Hampel* rule applied to ambiguous or equivocal invocations of the right to silence. Rather, the supreme court concluded that Munson's statements to the police were obtained unlawfully because Munson had *unambiguously* invoked his right to silence. *Id.* at 1046–47.

Because the supreme court majority concluded that Munson had unambiguously invoked his right to silence, the majority did not reach the issue of what restrictions the police should operate under when responding to a suspect's ambiguous or equivocal reference to the right to silence. The majority noted the United States Supreme Court's decision in *Davis* (*see Munson*, 123 P.3d at 1048–49 & nn. 40 & 43), but they declared that they did not have to decide "whether the police have an obligation to clarify an ambiguous invocation of the right to silence [or] whether the dual prongs of *Miranda* [*i.e.*, invocations of the right to silence versus invocations of the right to an attorney] are

entitled to differing levels of protection." *Munson*, 123 P.3d at 1047.

In other words, when this Court decided *Munson*, we rejected the interpretation of the law that was adopted by the superior court in Batts's case. And when the supreme court overturned our decision in *Munson*, the supreme court expressly left this issue undecided.

The State has not petitioned us to review the correctness of the superior court's decision to suppress the second portion of Batts's police interview, so we need not revisit the legal issues raised and left unresolved in *Munson*.

Rather, we decide a narrower issue: Assuming the correctness of the superior court's suppression ruling, is this second portion of Batts's post-arrest interview nevertheless admissible under Evidence Rule 412 to impeach Batts's trial testimony?

As we have explained, in order to answer this question, we must determine whether the *Miranda* violation was either intentional or egregious.

By describing the litigation history of the *Munson* case, we do not intend to express any opinion on the legal issues raised in *Munson*. In particular, we express no opinion on the question of whether the rule announced by the United States Supreme Court in *Davis* should be followed by the courts of Alaska in cases where a suspect makes an ambiguous or equivocal reference to the right of silence. Rather, our purpose is to show that this issue remains unresolved under Alaska law.

Because this issue is currently unresolved, even if we assume that we or the Alaska Supreme Court would ultimately agree with Judge Volland that the detectives who interrogated Batts violated *Miranda* by their responses to Batts's repeated statements, "Plead the Fifth", that violation can not reasonably be categorized as either intentional or egregious.

As shown by the quoted excerpts of Batts's post-arrest interrogation, the first two times that Batts declined to answer the detectives' questions, he used the phrase "I'd rather not

answer." Then he switched to "Plead the Fifth." When Batts first began using this phrase, the detectives clarified that Batts meant he did not want to answer that question, and then the interrogation continued. Later, when the detectives asked Batts to identify the person who he claimed had been the passenger in his car, Batts again said "Plead the Fifth." The detectives immediately asked, "So you won't tell us who the friend was that was with you?" Batts answered, "Nah."

Given this prologue, the detectives could reasonably conclude that Batts's subsequent statements, "Plead the Fifth", were likewise the equivalent of "I'd rather not answer." Batts never said anything to alert the detectives that he might be using the phrase to mean something else. Moreover, although the detectives stopped asking Batts to clarify his meaning each time, they did not respond to Batts's statements in a coercive manner or in a way that suggested that it was futile for Batts to continue to assert his *Miranda* right to silence.

In sum, there is no evidence to support the conclusion that the detectives' *Miranda* violation (if any) was either intentional or egregious. Accordingly, this second portion of Batts's post-arrest interview is admissible to impeach his trial testimony under Evidence Rule 412.

*Conclusion*

The superior court's ruling that Alaska Evidence Rule 412 violates the self-incrimination clause of the Alaska Constitution is REVERSED IN PART. Evidence Rule 412 is constitutional to the extent that it permits impeachment of a testifying defendant with statements obtained in violation of *Miranda* as long as the *Miranda* violation was neither intentional nor egregious.

With respect to the particular case before us, we conclude that if Batts takes the stand at his trial, the State may properly impeach him with the portion of his police interview that precedes his reference to an attorney. We reach no conclusion with respect to the remainder of the interview. The admissibility of that portion must be decided by the superior court using the test explained in this opinion.